# Illinois Official Reports

## Supreme Court

---

### *In re Linda B.*, 2017 IL 119392

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* LINDA B. (The People of the State of Illinois, Appellee, v. Linda B., Appellant). |
| Docket No. | 119392 |
| Filed<br>Rehearing denied | September 21, 2017<br>November 20, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. David Skryd, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Veronique Baker, Ann Krasuski, and Laurel Spahn, of Legal Advocacy Service of the Guardianship & Advocacy Commission, of Hines, for appellant.<br><br>Lisa Madigan, Attorney General, of Springfield, and Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Matthew Connors, Assistant State's Attorneys, of counsel), for the People.<br><br>Cheryl R. Jansen, of Equip for Equality, of Springfield, *amicus curiae*. |

Justices          CHIEF JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Justices Freeman, Thomas, Kilbride, Garman, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1    The overarching issue presented in this appeal is whether a timely petition was filed, seeking immediate, involuntary admission of respondent for inpatient psychiatric treatment in a mental health facility pursuant to article VI of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/3-600 *et seq.* (West 2012) (Emergency Admission by Certification)). In order to reach that issue, we must find that an exception to the mootness doctrine applies, as the 90-day period of hospitalization ordered by the Cook County circuit court has expired. The appellate court so found and affirmed the judgment of the circuit court. 2015 IL App (1st) 132134. On this record, and with some qualification with respect to the appellate court's analysis, we affirm the judgment of the appellate court.

¶ 2                                   BACKGROUND

¶ 3    Proceedings in this case were initiated on May 9, 2013, when Connie Shay-Hadley, the mental health facility director at Mount Sinai Hospital (Mt. Sinai), filed a petition alleging that respondent, Linda B., was a person subject to involuntary admission to a treatment facility. The petition sought emergency inpatient admission by certificate, pursuant to section 3-600 of the Mental Health Code (405 ILCS 5/3-600 (West 2012)), stating that respondent was admitted to the "Mental Health Facility/Psychiatric Unit" on April 22, 2013.

¶ 4    The petition was supported by certificates submitted by Dr. Medela Gartel, who examined respondent on May 9, 2013, and Colleen Kurtz, a licensed clinical social worker who examined respondent later that same day. Both checked form boxes stating that respondent was mentally ill and required "immediate hospitalization" for the prevention of harm to respondent or others. Both stated that respondent was in need of treatment to prevent deterioration of her condition and that she could not understand the nature of her illness or the need for treatment. Gartel added, via handwritten notation, that respondent had exhibited "multiple psychiatric symptoms including paranoid delusions," she had been violent with medical staff, and she had been wandering and defecating in the hall. Kurtz corroborated that observation as well as Gartel's suggestion that respondent suffered from paranoid delusions. Kurtz added that respondent was refusing both medical and psychiatric medications.

¶ 5    On June 11, 2013, the trial court held a hearing addressing the matter of involuntary admission.[1] At that hearing, Dr. Elizabeth Mirkin, a board-certified psychiatrist, testified that

_____

[1]Hearing on the May 9 petition was originally set for May 14, 2013, five days from the date upon which the petition was filed, which would seem to comport with the temporal requirement for a hearing set forth in section 3-611 of the Mental Health Code. See 405 ILCS 5/3-611 (West 2012) ("the court shall set a hearing to be held within 5 days *** after receipt of the petition"). Multiple "case management orders" were entered thereafter continuing the date for the hearing. Although the appellate

respondent's hospitalization at Mt. Sinai began on April 22, 2013, when she was admitted to a "medical floor," where she was also "treated psychiatrically." With respect to the circumstances prompting respondent's admission, Mirkin volunteered:

> "She actually was board—agitated and very angry behaviors before she was admitted in medical floor because she was tachycardia and found to be severely anemic.[2] She was admitted to the medical floor. She was followed by a psychiatrist throughout her stay on the medical floor."

Mirkin also stated that respondent had sitters "throughout her stay on the medical floor."

¶ 6    Mirkin testified that she first saw respondent on the medical floor on May 25, 2013. She had previously spoken to other staff members and had reviewed "other people psychiatry progress notes, nursing notes, doctors notes." Mirkin stated that respondent was hospitalized for "both" psychiatric and medical treatment. Mirkin noted that this was not respondent's first hospitalization. She had been admitted to Mt. Sinai's psychiatric unit in January 2013 "with similar presentation." According to Mirkin, respondent was admitted again in April. There had been "multiple prior hospitalizations." Mirkin diagnosed respondent as suffering from schizophrenic disorder, stating that respondent had suffered from that malady for years.

¶ 7    Mirkin described, in detail, the symptoms respondent had exhibited: "[S]he was very delusional, very aggressive, agitated and threatening, labile and did not sleep, threatened staff, did not take medications for psychiatric and medical reasons." Mirkin said that respondent was "much less symptomatic" at the time of the hearing because, pursuant to court order entered May 14, 2013,[3] respondent *was* taking prescribed medications. Though Mirkin acknowledged that respondent was "less symptomatic," she maintained that respondent was still delusional, easily agitated, aggressive, and subject to rapid mood swings. Mirkin observed that respondent had a history of noncompliance in taking medications, particularly whenever she was discharged from the hospital. Mirkin rendered her opinion, based upon a reasonable degree of psychiatric certainty, that respondent was unable, because of her mental illness, to provide for her basic physical needs without assistance and thus should be treated on an inpatient basis. Mirkin recommended that respondent be treated at Park Shore Nursing Home.

---

court makes no mention of it, an amended petition for involuntary admission was filed on June 11, the day of the hearing. That petition appears to differ from the original petition in that (1) it was no longer alleged, as a basis for involuntary admission, that respondent "could be reasonably expected to engage in conduct" that might physically harm herself or others and (2) a report before disposition was attached—with supporting documentation from Kurtz and an "attending psychiatrist"—addressing an alternative treatment setting. The deleted allegation may have been in furtherance of a recommendation that respondent, who was homeless, be sent to a nursing home. We note, in passing, that Kurtz, in her statement, referred to having seen respondent "on psychiatric unit during previous admission." Dates are not provided, so it is not clear when that "previous admission" might have been. In any event, the parties do not accord the filing of the amended petition any significance, and respondent does not complain that *the hearing* in this case was untimely. Therefore, we will not further address that procedural aspect of the case.

[2]Dr. Mirkin testified that she graduated from medical school in St. Petersburg, Russia. At times, the syntax of her testimony corroborates the inference that English is not her first language. Grammatical lapses will not be noted hereafter.

[3]The record indicates that medication was ordered in case No. 2013 COMH 1388.

- 3 -

¶ 8    In her cross-examination, counsel for respondent asked: "Is [respondent] recommended for nursing home placement because of mental health reasons or because of medical reasons?" Mirkin responded:

> "Because of combination of mental health reasons and medical reasons. In her case, her mental health conditions prevents her from taking care of her medical condition. When she has exacerbation of her mental illness, then she doesn't take care of herself, including her many medical conditions."

Inquiries by counsel regarding Park Shore Nursing Home revealed that Mirkin had very limited knowledge thereof. However, when asked whether Park Shore Nursing Home provided "behavioral mental health care or whether they primarily provide[d] medical care to elderly senior citizens," Mirkin replied: "Because [respondent's] diagnosis is schizoaffective disorder, she could not be admitted to the nursing home, which does not provide care for behavioral health."

¶ 9    Upon further examination of Mirkin by respondent's counsel, the following colloquy ensued:

> "Q. Doctor, according to the chart, you've indicated as of approximately May 28th, the respondent was ready for discharge from Mt. Sinai, correct?
>
> A. I had a note there. I saw her on the unit and I didn't say that she is ready for discharge. I said that she does not need inpatient level of psychiatric care.
>
> I said this is her baseline, but I never indicated that she could be discharged home. There was a process going on while she was on medical floor for her to be admitted to the nursing home; and by my note, I stated that she does not need to be transferred to inpatient psych unit.
>
> Q. So all this time, from April 22nd to the present day, [respondent] has been on a medical unit and not a psychiatric hospital [*sic*] at the hospital?
>
> A. She was cleared medically only as of last Saturday. *** At that time we found out we're going with a nursing home placement. There's no point of her to be transferred to six—the transfer to Six East mainly because on the medical floor, she's been on one-to-one supervision; and the nursing home will not accept anybody to the nursing home unless their 24 hours of supervision and psychiatric unit is more appropriate for her.
>
> She hasn't been on supervision here unless she was admitted there last night. She hasn't been put on one-to-one supervision.
>
> While on medical floor, she needed one-to-one sitter. *** Constantly, she needed to have supervision all of the time.
>
> Q. That's one of the conditions for Park Shore to accept [respondent], that she goes 24 hours without having a sitter?
>
> A. Yes. Any nursing home inpatient, yes."

¶ 10    Following cross-examination and after the State rested, respondent's counsel moved to dismiss the petition for involuntary admission "based upon the petition having been filed well beyond the 24 hours after [respondent's] admission." Counsel argued that the petition was untimely filed where respondent was admitted to the medical floor of Mt. Sinai on April 22, 2013, but was also being treated psychiatrically from that date.

- 4 -

¶ 11    Over counsel's objection, the court allowed the State to reopen its case in order to adduce evidence pertinent to respondent's motion. Speaking to the procedures the hospital generally employs with respect to involuntary admission, Mirkin explained:

> "We have—when patient is admitted to medical floor, if medical team feels that psychiatric treatment needed or psychiatrist needs to be seen, we feel and I feel and consults every day, four or five patients.
>
> We don't submit any petitions for any other patients unless we start believing that patients need, either psychiatric admission or patient needs treatment against their will.
>
> Patients are on typical medical floor without—even now at this moment, I see like every day, I see four or five patients on medical floors. We do not do petitions unless we think the patient needs to go to court because the patient is noncompliant with treatment."

Counsel for the State asked: "Was the decision made when it was determined that she needed inpatient psychiatric treatment?" Mirkin responded:

> "At that time she was still on medical floor. I was not in service at that time, but I reviewed the chart. I thought it was appropriate when the doctor went to court on May 14 because it was considered that she needed psychiatric treatment and she was not taking medications."

Counsel for the State then asked: "So initially, the primary purpose for [respondent's] hospitalization was for medical treatment?" Mirkin responded: "For both, but she was on medical floor, so we never start petitions while patient is on medical floor, unless we think that she needed more psych, more structured environment. It is not at all appropriate. We never do this."

¶ 12    Following Mirkin's testimony, the circuit court denied respondent's motion to dismiss the petition for involuntary admission. Respondent then rested without testifying or presenting evidence.

¶ 13    After closing argument, the circuit court granted the petition for involuntary admission. In its written order, the court found respondent subject to involuntary admission on an inpatient basis because (1) respondent's mental illness rendered her unable to provide for her basic physical needs and to guard herself from serious harm and (2) respondent's mental illness resulted in (a) her refusal of necessary treatment, (b) her inability to understand the need for such treatment, and (c) a reasonable expectation that, if respondent was not treated, she would suffer further mental or emotional deterioration. The written order also provided that respondent be treated at Park Shore Nursing Home, based on Dr. Mirkin's recommendation, for a period of hospitalization not to exceed 90 days.

¶ 14    In respondent's ensuing appeal, the appellate court first noted that respondent's 90-day period of hospitalization had expired, rendering the appeal moot, as the appellate court could no longer grant respondent effectual relief. 2015 IL App (1st) 132134, ¶ 11. However, the appellate court considered and applied the public interest exception to the mootness doctrine to address the merits of the issues raised by respondent. *Id.* ¶ 13.

¶ 15    On the merits, the appellate court appears to have resolved this case on the bases of two premises: (1) respondent's "physical" admission to the hospital was not synonymous with "legal" admission under article VI of the Mental Health Code (2015 IL App (1st) 132134, ¶ 19), and (2) the medical floor of the hospital, arguably, was not a "mental health facility"

- 5 -

within the meaning of the statute, irrespective of whether psychiatric treatment was rendered there (*id.* ¶ 23). Thus, the appellate court affirmed the judgment of the circuit court, concluding that the petition for involuntary admission was timely filed.

¶ 16                                                    ANALYSIS

¶ 17     Initially, we note that this appeal is moot because respondent's underlying 90-day admission period has expired. See *In re Andrew B.*, 237 Ill. 2d 340, 346 (2010). Consequently, we must determine whether an exception to the mootness doctrine applies. *Id.* One exception to the mootness doctrine allows a court to resolve an otherwise moot issue if the issue involves a matter of substantial public interest. *Bettis v. Marsaglia*, 2014 IL 117050, ¶ 9. Respondent argues that exception applies to questions posed in this appeal.

¶ 18                                       I. Public Interest Exception

¶ 19     The public interest exception permits review of an otherwise moot appeal when three requirements are met: (1) the question presented must be public rather than case-specific in nature; (2) an authoritative determination is needed to guide public officers in future cases; and (3) there is a likelihood the issue will recur. *People v. Holt*, 2014 IL 116989, ¶ 47; *Andrew B.*, 237 Ill. 2d at 347. This exception must be construed narrowly and established by a clear showing of each criterion. *Andrew B.*, 237 Ill. 2d at 347.

¶ 20     We believe the requisites for application of the public interest exception are satisfied in this case. " '[T]he procedures which must be followed *** before a court may authorize involuntary treatment to recipients of mental health services are matters of a public nature and of substantial public concern.' " *In re Lance H.*, 2014 IL 114899, ¶ 14 (quoting *In re Mary Ann P.*, 202 Ill. 2d 393, 402 (2002)). Obviously, as this court acknowledged in *Lance H.*, the same can be said of the procedures for involuntary *commitment*. *Id.* Moreover, we find that the circumstances in this case meet the second criterion for application of the exception because there is apparently uncertainty as to the type of facilities, or portions thereof, that meet the statutory definition of a "mental health facility" (see 2015 IL App (1st) 132134, ¶ 23 (the appellate court in this case assumed, "*arguendo*, that respondent was in a mental health facility" while citing appellate authority that clearly suggests otherwise)) and, relatedly, whether the type of treatment administered in a facility may, in itself, qualify it as a "mental health facility." Even more to the point, this case presents the question of whether simultaneous, hybrid treatment, for *both* psychiatric and medical conditions, either qualifies (in the first instance) or disqualifies (in the second) the recipient for status as a mental health patient in a facility, depending upon which condition predominates. Finally, the third criterion for application of the exception is met because, as was the case in *Lance H.*, "respondent's own history demonstrates how this question might recur." *Lance H.*, 2014 IL 114899, ¶ 14. Dr. Mirkin testified that respondent has a history of noncompliance in taking medications, particularly whenever she was discharged from the hospital, and she has had "multiple prior hospitalizations." As was the case in this instance—and is likely the case in many others—respondent "presented" at the hospital with interrelated psychiatric and medical problems, which are necessarily subject to holistic treatment and the origins of which are not subject to neat temporal or treatment categorization. We see this scenario as one likely to recur

in the general population.

¶ 21                              II. Pertinent Statutes

¶ 22        Section 3-600 of the Mental Health Code authorizes a person 18 years of age or older to seek involuntary admission, "to a mental health facility," of an individual 18 years of age or more, who is "in need of immediate hospitalization." 405 ILCS 5/3-600 (West 2012). Section 1-114 of the Mental Health Code defines a "mental health facility" as "any licensed private hospital, institution, or facility or section thereof, and any facility, or section thereof, operated by the State or a political subdivision thereof for the treatment of persons with mental illness and includes all hospitals, institutions, clinics, evaluation facilities, and mental health centers which provide treatment for such persons."[4] 405 ILCS 5/1-114 (West 2012).

¶ 23        Section 3-601(a) of the Mental Health Code provides:

"When a person is asserted to be subject to involuntary admission on an inpatient basis and in such a condition that immediate hospitalization is necessary for the protection of such person or others from physical harm, any person 18 years of age or older may present a petition to the facility director of a mental health facility in the county where the respondent resides or is present. The petition may be prepared by the facility director of the facility." 405 ILCS 5/3-601(a) (West 2012).

¶ 24        Section 3-601(b)(1) sets forth the aspects of a respondent's condition that must be addressed in the petition. Subsection (b)(1) requires a "detailed statement of the reason for the assertion that the respondent is subject to involuntary admission on an inpatient basis, including the signs and symptoms of a mental illness and a description of any acts, threats, or other behavior or pattern of behavior supporting the assertion and the time and place of their occurrence." 405 ILCS 5/3-601(b)(1) (West 2012).

¶ 25        Section 3-602 of the Mental Health Code requires that the petition be "accompanied by a certificate executed by a physician, qualified examiner, psychiatrist, or clinical psychologist which states that the respondent is subject to involuntary admission on an inpatient basis and requires immediate hospitalization." 405 ILCS 5/3-602 (West 2012). The certificate must evince an examination of the respondent "not more than 72 hours prior to admission" and must contain "other factual information relied upon in reaching a diagnosis, and a statement as to whether the respondent was advised of his rights under Section 3-208." *Id.*

¶ 26        Finally, section 3-611, at issue here, provides:

"Within 24 hours, excluding Saturdays, Sundays and holidays, after the respondent's admission under this Article, the facility director of the facility shall file 2 copies of the petition, the first certificate, and proof of service of the petition and statement of rights upon the respondent with the court in the county in which the facility is located. Upon completion of the second certificate, the facility director shall promptly file it with the court. The facility director shall make copies of the certificates available to the attorneys for the parties upon request. Upon the filing of the petition and first

---

[4]Section 1-113 of the Mental Health Code further defines a "licensed private hospital" as "any privately owned home, hospital, or institution, or any section thereof which is licensed by the Department of Public Health and which provides treatment for persons with mental illness." 405 ILCS 5/1-113 (West 2012).

- 7 -

certificate, the court shall set a hearing to be held within 5 days, excluding Saturdays, Sundays and holidays, after receipt of the petition. The court shall direct that notice of the time and place of the hearing be served upon the respondent, his responsible relatives, and the persons entitled to receive a copy of the petition pursuant to Section 3-609." 405 ILCS 5/3-611 (West 2012).

### III. Merits

The parties' arguments concerning the timely filing of the petition focus on two questions. First, under the circumstances, did the medical floor of Mt. Sinai qualify as a "mental health facility" as specified in article VI of the Mental Health Code? Second, what constitutes "admission" for purposes of section 3-611?

### A. "Mental Health Facility"

Respondent contends that the appellate court erred when it failed to find that the medical floor of Mt. Sinai—where she was treated for medical *and* psychiatric conditions—qualified as a "mental health facility," as defined by the Mental Health Code. Respondent observes that the Mental Health Code broadly defines a "mental health facility" as a private facility, or a section thereof, or a facility operated by the State or its political subdivisions, that (1) is licensed by the Department of Public Health and (2) provides treatment for persons with mental illness. See 405 ILCS 5/1-114 (West 2012). She observes that section 1-114 does not require that a mental health facility have a *primary* purpose of treating individuals with mental illnesses. Respondent notes that Mt. Sinai is a licensed general hospital that—as Dr. Mirkin testified—regularly provides treatment to people with mental illnesses on its medical floors, as well as in the psychiatric unit. Respondent thus submits, relying upon the psychiatric treatment she received on a medical floor of the hospital, that the medical floor qualified as a "mental health facility" as defined by the Mental Health Code.

Respondent takes issue with the appellate court's reliance upon *In re Moore*, 301 Ill. App. 3d 759, 766 (1998), arguing that *Moore*'s narrow construction of the term "mental health facility"—with respect to hospitals, meaning only "[t]hose sections or units" specifically dedicated to the treatment of mentally ill patients—is not consistent with the "current reality," in which psychiatric services are provided in diverse venues offering both medical and psychiatric treatment. Respondent notes, for example, that the Illinois Department of Human Services website directs that those suffering psychiatric emergencies go, or be taken, to the emergency room at their local hospital.[5] Respondent also points to section 3-606 of the Mental Health Code, which provides that a peace officer "may take a person into custody and transport him to a mental health facility when the peace officer has reasonable grounds to believe that the person is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization to protect such person or others from physical harm." 405 ILCS 5/3-606 (West 2012). Respondent states that the appellate court "has interpreted this section, and has applied it to hospital emergency room departments without question though, according to its language,

---

[5]See *Mental Health*, Ill. Dep't Hum. Servs., http://www.dhs.state.il.us/page.aspx?item=29735 (last visited Sept. 8, 2017).

that section applies specifically to 'mental health facilit[ies].' "[6] Further, she asks us to take judicial notice of 94 involuntary admission petitions, filed over a 22-month period (September 2014 to June 2016), by hospitals that—according to respondent—lack mental health units.[7]

¶ 32    Respondent concludes: "To construe the Code as applying only to distinct psychiatric units would result in disparate treatment of individuals with mental illnesses based on the location of their treatment. *** If this court affirms the appellate court's decision in *In re Linda B.*, people could be held in scatter beds[8] on medical floors or in emergency rooms without their consent and without the legal protections the Code guarantees." Further, to the extent that the treatment afforded a patient in a facility may affect the statutory category into which the facility properly fits, the respondent argues that "respondents [should not] have different rights at different times dictated by the status of their non-psychiatric health. Individuals without comorbid medical conditions who could be admitted directly to psychiatric units would be afforded the Code's protections of notice, right to counsel, and their day in court, whereas recipients *with* serious comorbid conditions would not." (Emphasis in original.)

¶ 33    As we understand *the State's* position—or positions—the State first advocates for a bright-line rule, relying upon *Moore*, arguing that the legislature intended that section 3-611 only apply when a patient is admitted to a facility or section thereof specifically designated as, and operating exclusively as, a "mental health facility." The State notes that *Moore* held the language of the pertinent "statutory provisions recognizes that there may be sections within a hospital devoted to treatment of mentally ill patients" and concluded "[t]hose sections or units, and not the entire hospital, are mental health facilities for purposes of the involuntary admission provisions of the Code." *Moore*, 301 Ill. App. 3d at 766.

¶ 34    However, the State also appears to concede that the type of treatment provided to a patient is relevant in determining the *kind* of facility in which the patient receives treatment. The State acknowledges, for example, that "section 5/1-114 implicitly suggests that an emergency room could be considered a mental health facility as a 'section' of a private hospital when used 'for the treatment of persons with mental illness.' " Notwithstanding, the State submits "[t]hat does not alter the calculus here, where Dr. Mirkin's testimony made clear that respondent was admitted for medical care, and in addition to that care, received psychiatric care." By that acknowledgment, the State appears to retreat from espousing a bright-line rule, such as that

---

[6]Respondent cites *In re Demir*, 322 Ill. App. 3d 989, 990-92 (2001), and *In re Joseph P.*, 406 Ill. App. 3d 341, 348 (2010), *overruled on other grounds by In re Rita P.*, 2014 IL 115798, ¶¶ 33-34.

[7]Public documents, such as those included in the records of other courts and administrative tribunals, fall within the category of "readily verifiable" facts capable of instant and unquestionable demonstration of which a court may take judicial notice. *Cordrey v. Prisoner Review Board*, 2014 IL 117155, ¶ 12; *May Department Stores Co. v. Teamsters Union Local No. 743*, 64 Ill. 2d 153 (1976). The fact that the referenced petitions were filed meets the criteria for judicial notice; that the hospitals in question lacked designated psychiatric facilities turns out to be *not* so readily verifiable. We decline to take judicial notice of respondent's representation in that respect. In the end, it makes no difference in our analysis or the outcome.

[8]"Scatter beds" is a term used in the psychiatry field to refer to psychiatric patient placement in beds designated for general medical treatment throughout a medical facility, rather than in devoted psychiatric units. Tami L. Mark *et al.*, *Psychiatric Discharges in Community Hospitals With and Without Psychiatric Units: How Many and for Whom?*, 61 Psychiatric Servs. 562 (2010).

announced in *Moore*, seemingly advocating for a primary-purpose-of-treatment test and minimizing the significance of the medical venue where psychiatric treatment is provided.

¶ 35 We note, initially, that it is far from "clear," based upon the only testimony at the hearing—Dr. Mirkin's—that it was respondent's medical condition alone that brought her to someone's attention and resulted in her hospitalization or even that her medical condition was the *primary* factor in her hospitalization and treatment. The certificates filed in support of the petition for involuntary admission do not suggest a contrary inference. Though the State, at the hearing in this matter, attempted to solicit Mirkin's acquiescence to the proposition that, "initially, the primary purpose for [respondent's] hospitalization was for medical treatment," Mirkin responded—contrary to the State's suggestion otherwise in its brief[9]—that respondent was admitted for "both" psychiatric and medical treatment. In fact, Mirkin's testimony indicated that it was respondent's *psychiatric* condition that led to her acute medical problems: "In her case, her mental health conditions prevents her from taking care of her medical condition. When she has exacerbation of her mental illness, then she doesn't take care of herself, including her many medical conditions." Mirkin indicated that respondent exhibited "agitated and very angry behaviors before she was admitted in [the] medical floor," and Mirkin acknowledged that respondent was "followed by a psychiatrist throughout her stay on the medical floor" and had sitters "throughout her stay on the medical floor."

¶ 36 It would seem to us that respondent's psychiatric treatment and supervision on the medical floor were at least as comprehensive and structured as anything she might have received in the psychiatric unit, which the State has to concede *is* a "mental health facility." We think most people of ordinary sensibility would agree with the application of abductive reasoning in this instance and conclude that a facility, or section thereof, capable of providing mental health services, that does in fact provide the individual mental health services, *is* a mental health facility.[10] To find otherwise is to exalt a facility's self-designated nomenclature over its actual function. We decline to do so.

¶ 37 And there is no reason to do so. The legislature made the definition of "mental health facility" extremely broad so as to encompass *any* place that provides for "the treatment of persons with mental illness." 405 ILCS 5/1-114 (West 2012). It bears repeating that the Mental Health Code defines a "mental health facility" as "*any* licensed private hospital, institution, or

---

[9]The State asserts, in its brief, that "the *primary* purpose of respondent's treatment was to address her deteriorating physical condition" (emphasis added) and "[o]nce her physical health had been stabilized, respondent was moved to a psychiatric floor, and the petition for involuntary treatment was filed within 24 hours." We find no clear support in the record for either proposition. Mirkin declined to subscribe to the proposition the State now asserts, and her testimony was ambiguous as to whether respondent was moved to a psychiatric unit and, if so, when; the same can be said of Kurtz's documentary reference to having seen respondent on a "psychiatric unit during [a] previous admission." Similarly, elsewhere in the State's brief, the State asserts that "Dr. Mirkin's testimony was clear that respondent was admitted to the emergency room at Mount Sinai Hospital, but was then placed on a medical floor for weeks to address her underlying health concerns." Although we might assume that respondent entered the hospital via the emergency room, the term "emergency room" does not appear in this record, and Dr. Mirkin never testified that respondent was admitted there.

[10]With no intent to be flippant, the abductive process is probably never better put than in this common expression: If it looks like a duck, swims like a duck, and quacks like a duck, then it is probably a duck.

- 10 -

facility or section thereof, and *any* facility, or section thereof, operated by the State or a political subdivision thereof for the treatment of persons with mental illness and includes *all* hospitals, institutions, clinics, evaluation facilities, and mental health centers which provide treatment for such persons." (Emphases added.) 405 ILCS 5/1-114 (West 2012). The definition could not be more comprehensive. The legislature sought to include within its ambit the whole facility or a section thereof and private as well as public facilities. The salient feature of the definition is that it applies to any facility, or any part of a facility, that provides for "the treatment of persons [afflicted] with mental illness." What the facility is called, if and when it performs some other function, is irrelevant. In those instances in which a facility or section of a facility provides psychiatric treatment to a person with mental illness—as was the case here—it qualifies as a "mental health facility" for purposes of the Mental Health Code's application.

¶ 38    As this court has repeatedly acknowledged, the administration of involuntary mental health services involves a " ' "massive curtailment of liberty." ' " *In re Robert S.*, 213 Ill. 2d 30, 46 (2004) (quoting *In re Barbara H.*, 183 Ill. 2d 482, 496 (1998), quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)). As aptly noted in *In re Torski C.*, 395 Ill. App. 3d 1010, 1018 (2009), the provisions of the Mental Health Code reflect legislative recognition that civil commitment is a deprivation of personal liberty, and the purpose of its procedures is to provide adequate safeguards against unreasonable commitment. We believe the legislature enacted a broad definition of "mental health facility" to further those ends. Appellate decisions inconsistent with our holding herein are hereby overruled.

¶ 39    In today's era of integrated, holistic health care, we believe it is unrealistic to think that medical personnel on a medical floor or in an emergency room—or anyone for that matter—would not recognize and report someone with psychiatric symptoms as striking as respondent's and that psychiatric specialists and structured treatment would not be brought to bear, irrespective of the medical environment wherein the patient is housed. On the other hand, one might well understand how a patient could be treated psychiatrically, involuntarily, in facilities not specifically designated as "mental health facilities" and thus be deprived of the Mental Health Code's safeguards. It could well have happened here.

¶ 40    However, we do not *know* it happened here because the record does not reflect that, prior to the filing of this petition on May 9, 2013, respondent was an involuntary recipient of psychiatric services in the hospital. We can readily assume, at some point in time, she resisted psychiatric treatment, but we do not know for certain when that occurred. Here, we address the second question posed at the outset of our analysis: What constitutes "admission" for purposes of section 3-611?

¶ 41    There is no dispute that respondent was physically admitted to the hospital as a patient on April 22, 2013. The petition for involuntary admission states as much.[11] However, nothing in this record identifies the capacity in which respondent was admitted, *i.e.*, whether she was a voluntary or involuntary recipient of treatment. At oral argument, counsel for respondent conceded as much, but she argued that the evidence suggested that respondent was there involuntarily. Counsel for the State countered that the issue of consent to treatment was not

---

[11]It also states that respondent was admitted to the "Mental Health Facility/Psychiatric Unit" on that date.

developed at the June 11 hearing and that it was unclear on what date respondent became noncompliant or treatment became involuntary. Pressed upon this point at oral argument, counsel for respondent noted that she tried at the hearing to ask Dr. Mirkin by what legal authority treatment was provided to respondent—consensual or otherwise—but the trial court sustained the State's objection that the question was beyond the scope of direct examination. Counsel explained to this court: "Then there was a decision that that was not needed to be covered in any kind of case-in-chief, because of trial strategy." Counsel did not elaborate on, and we cannot conceive, what the aim of that strategy would have been.

¶ 42     What we are left with is bare-bones evidence of physical admission to the hospital, with some evidence of communication between hospital personnel and unidentified family members of respondent. Respondent's daughter was specifically identified in the petition for involuntary admission. There was no evidence as to the exact means by which respondent came to the hospital or how she was admitted there. For all we know, respondent may have been persuaded to go there voluntarily by family members. Treatment may have been consensual for a time. As the State suggests, it *is* unclear what date respondent became noncompliant or treatment became involuntary.

¶ 43     During oral argument, counsel for respondent was asked whose responsibility it was to show respondent was previously in the hospital involuntarily. Counsel for respondent would place that burden on the State, but we believe it is respondent's burden. It is well established that, on appeal, the party claiming error has the burden of showing any irregularities that would justify reversal. *Flynn v. Vancil*, 41 Ill. 2d 236, 241 (1968). Error is never presumed by a reviewing court; it must be affirmatively shown by the record. *Id.* at 241-42. It is the appellant's burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and any doubts that may arise from the incompleteness of the record will be resolved against the appellant. *Williams v. BNSF Ry. Co.*, 2015 IL 117444, ¶ 31.

¶ 44     Counsel for respondent was aware of the significance of respondent's legal status prior to the filing of the petition; she attempted, unsuccessfully, to cross-examine Mirkin on that very point during the June 11 hearing. She could have revisited that issue in her portion of the case, but she informed us during oral argument that she decided not to do so. In order to establish untimely filing of the May 9 petition, respondent had to establish that her initial period of hospitalization and psychiatric treatment was involuntary. Whether she could have done so or not, respondent's counsel did not make that record.

¶ 45     If the initial treatment was not rendered against respondent's will, which is entirely possible—it is reasonable to infer that some change in respondent's volitional disposition might have prompted the filing of the petition, after weeks of treatment—then we have a situation governed by this court's analysis in *Andrew B.*, as the State contends. In that case, this court acknowledged what would seem obvious: that a patient's legal status within a facility may change while the patient is a resident there.

¶ 46     In *Andrew B.*, respondent voluntarily entered the facility for treatment but later expressed a desire to leave. A petition for involuntary admission was filed but was later voluntarily dismissed by the State. The court ordered respondent's discharge; however, respondent was not physically released. Instead, the next day a petition was filed for respondent's emergency admission by certificate under section 3-600 of the Mental Health Code. That petition, like the previous one, was then voluntarily dismissed by the State, and the court again ordered

respondent's discharge. Again, respondent was not released. Yet another petition was filed for emergency admission pursuant to section 3-600. The circuit court ultimately granted the petition and, en route to that disposition, denied respondent's motion to dismiss, wherein he had argued, because he was never physically released pursuant to the court's previous discharge orders, his continued detention at the facility violated his rights under the Mental Health Code and entitled him to a full and complete release. *Andrew B.*, 237 Ill. 2d at 343-45.

¶ 47    The appellate court affirmed, rejecting respondent's argument that the petition seeking his involuntary admission was untimely filed under section 3-611 of the Mental Health Code. *In re Andrew B.*, 386 Ill. App. 3d 337 (2008).

¶ 48    We reached the same result. In upholding the order of the circuit court and rejecting respondent's contention that the emergency petition was untimely filed, we noted that "the Code refers to 'admission' in a legal sense to describe the individual's legal status" within a facility. *Andrew B.*, 237 Ill. 2d at 350. "In other words, section 3-611's reference to 'admission' is not always limited to the individual's original physical entry." *Id.* Andrew entered the facility on a voluntary basis, but while there, his legal status changed pursuant to the filing and granting of an emergency petition for involuntary admission.

¶ 49    The takeaway, for our purposes, is that legal status may change while one is in a mental health facility—and that could well be the case here. Respondent has not demonstrated that her physical entry into the facility, and her initial treatment there, were involuntary. Thus, she has not demonstrated that error occurred, that the petition for involuntary commitment was not timely filed.

¶ 50    This court is not bound by the appellate court's reasoning and may affirm on any basis presented in the record. *People v. Williams*, 2016 IL 118375, ¶ 33. We apply that principle here.

¶ 51    For the foregoing reasons, the judgment of the appellate court is affirmed.

¶ 52    Affirmed.