2022 IL App (1st) 211077-U

No. 1-21-1077

Order filed September 19, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 MC2 2084 |
| | ) | |
| OVIDIU ASTALUS, | ) | Honorable |
| | ) | Paul S. Pavlus, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's convictions affirmed where the trial evidence was sufficient to convict him of aggravated assault, including that he used a deadly weapon in committing assault because the evidence showed he took the loaded clip or magazine of a gun and displayed it to the victim to substantiate his threat to "shoot this place up."

¶ 2    Ovidiu Astalus was convicted of aggravated assault and disorderly conduct after a bench trial and sentenced to a year of conditional discharge and six months of supervision, respectively.

He appeals from his aggravated assault conviction, contending that he did not use a deadly weapon in committing assault.

¶ 3                                  Background

¶ 4     Astalus was charged with aggravated assault without lawful authority by knowingly engaging in placing Jason Siegler in reasonable apprehension of a battery while using a firearm or device without discharge. 720 ILCS 5/12-2(c)(1) (West 2020). He also was charged with two counts of disorderly conduct for knowingly acting unreasonably, alarming or disturbing Siegler and Stephen Foley, and provoking a breach of the peace. *Id.* § 26-1(a)(1).

¶ 5     At trial, Siegler, a finance manager at a car dealership, testified that Astalus came into his office screaming, "Where is my f*cking car?" He recognized Astalus as having bought a Bentley from the dealership for which Siegler had prepared the paperwork. Siegler replied to Astalus's outburst, "Give me a moment and let me find out." But, Astalus loudly repeated his question.

¶ 6     Astalus then reached behind with both hands, and Siegler heard a click that, as a gun owner, he recognized as the ammunition clip or magazine being ejected from a gun. Astalus slammed the clip onto Siegler's desk with his right hand, "showed me the clip loaded with bullets," and "threatened to shoot me and burn the place." Siegler saw bullets in the clip. Astalus said he "will shoot his place up" and burn it. Siegler felt scared and threatened and feared for his life. Astalus "kept screaming, returned the clip back to the weapon, screamed again, and then turned and walked out." Siegler tried to call the police, but the telephone "didn't go through," so he informed a coworker to call police about "an armed suspect in the building."

¶ 7     Siegler "could still hear him screaming through the building" and looked for Astalus to "make sure everyone else was safe." Instead, he found Astalus in the Bentley service department,

where he was yelling at Foley, "Where is my car? You guys ran my credit four times. Where is my f*cking car?" When Astalus saw that Siegel was there, he returned to Siegel, called him "dirty names," and demanded his car. Foley approached and tried to separate Astalus and Siegler, reminding Astalus of the pandemic and asking him to put on a mask. When Foley tried to hand Astalus a mask, he refused it.

¶ 8     Siegler identified security video from the dealership, which he had viewed before trial. The video was entered into evidence. (The record on appeal does not include the video. An appellant bears the burden of presenting a sufficiently complete record to support their claims of error, and doubts arising from an incomplete record are resolved against the appellant. *In re Linda B.*, 2017 IL 119392, ¶ 43.)

¶ 9     On cross-examination, Siegler testified that Astalus never pointed the gun at him. He did not see Astalus's gun, except for the clip, until after his arrest. He did not see Astalus eject the clip, as he did so behind his back, but Siegler was looking "directly" at Astalus's hands and body and heard the "extremely distinct" sound of a clip being ejected. The metallic gray clip contained multiple bullets. When shown two photographs of a clip, Siegler testified that they appeared to be the clip, but he could not be certain without seeing the clip itself. Siegler admitted that Astalus did not slam the clip onto his desk "with force," but he heard it strike the glass desktop. Also, Astalus's voice was raised but not screaming when he said he would "shoot this place up." When Astalus returned the clip to the gun, he did so again by reaching both hands behind his back.

¶ 10     Siegler prepared and signed an affidavit regarding the incident at the behest of the dealership's attorney. His affidavit quoted Astalus's remarks with multiple exclamation marks, which he explained meant "someone making an aggressive tone." He believed he mentioned to

police Astalus's threat to burn the dealership. Siegler acknowledged that the security video recorded Astalus demanding his car but not threatening to burn the place, nor could one hear Astalus say he would shoot the place up at the point Siegler indicated he said that. On the video, Siegler pointed out where Astalus reached behind him as he stood in front of Siegler's desk but could not point to Astalus putting the clip back in the gun.

¶ 11    Foley, the dealership's owner and general manager, testified that Astalus, a customer, "came in *** with a gun and was threatening our employees." He saw Astalus meet with Siegel, then come into the Bentley service area screaming a string of "every obscenity I have ever heard in my life" and that he was going to "take us down" and "shoot up the place." Astalus was "spitting with no mask," as he yelled. Astalus "kept encroaching my space *** [a]nd I kept stepping back." When Siegler came over, Astalus tried to "get in [his] face," and Foley tried to separate them. Another employee called the police, who arrived after several minutes of Astalus "ranting and raving." When the officers frisked Astalus, they found a gun tucked in his back waistband.

¶ 12    On cross-examination, Foley testified that when Astalus asked about his car, Foley replied that it was not his car but the dealership's because Astalus had not paid for it. Foley and Astalus argued for some time, pointing and yelling at each other. Foley did not recall Astalus threatening to shoot the place up when he was arguing with Foley, and Foley admitted that he was recalling what happened with Siegler. While "a lot" of spit landed on Foley, Astalus did not purposely spit on him but yelled while not wearing a mask.

¶ 13    Officer Curtis Cornier testified that he responded to the report of a dispute with "a weapon implied." He saw Astalus in a heated argument with Foley. Astalus complied when Cornier told him to raise his hands. When Cornier asked if Astalus had a gun, Astalus replied that he had one

in the back of his waistband. Officer Cornier then retrieved a "small semiautomatic pistol" and noticed it had no magazine or clip. A further search found the clip containing bullets in Astalus's pants pocket.

¶ 14    Officer James Simmons testified for the defense that he interviewed Siegler, who did not mention that Astalus threatened to burn down the dealership.

¶ 15    Astalus testified that he went to the dealership because he bought a new Bentley about a month earlier that had just been repossessed. He had a gun with him when he went to the dealership because he carried a gun daily. He had a valid Firearm Owner's Identification Card (FOID) and a concealed carry license. He did not keep the clip in the gun because his wife insisted he keep the gun and clip separate, but he carried the clip in his pocket. He denied taking the clip out of his pocket at the dealership and expressly denied showing Siegler the clip or his gun. He admitted repeatedly demanding his "f*cking car" but denied threatening to shoot Siegler or mentioning his gun. When he left Siegler's office and went to the Bentley service area to ask Foley about his car, Foley responded with an obscenity. Astalus and Foley then spoke for about 5-10 minutes, during which Foley and Astalus both used obscenities. Astalus denied spitting on anyone or threatening to shoot.

¶ 16    On cross-examination, Astalus testified that he was "pissed off" about his car being repossessed and "felt entitled to get [his] property back." He did not touch his gun, which was in his waistband concealed by his shirt. He admitted reaching behind him at one point while in Siegler's office but denied reaching into his waistband. He denied that Foley backed away from him as they yelled at each other.

¶ 17    The court found Astalus guilty of aggravated assault and one count of disorderly conduct against Foley. In its ruling, the court expressly found that it saw Astalus "on the video" put his hands behind his back and place the clip or magazine on Siegler's desk and that Astalus took out the clip "to prove his point that I'm going to do everything necessary to get my car." The court did not see Astalus to put the clip back and believed Astalus placed the clip in his front pocket. The court found that the threat to "shoot this place up," combined with "putting the clip from a firearm that Astalus has on his person at that particular time on the desk," constituted aggravated assault.

¶ 18    The trial court sentenced Astalus to one year of conditional discharge for aggravated assault and six months of supervision for disorderly conduct, to be served concurrently. The conditional discharge prohibited Astalus from possessing a firearm until May 11, 2022, and required him to surrender his FOID and concealed carry license. The trial court also fined Astalus.

¶ 19                                    Analysis

¶ 20    Astalus contends that he did not use a deadly weapon in committing assault. In particular, he challenges whether he "used" a deadly weapon and claims that "use" for purposes of aggravated assault must consist of pointing a firearm at someone or at least drawing or brandishing a weapon. He contends that in finding him guilty, the trial court misinterpreted ambiguous statutory language and, thus, maintains that we should apply a *de novo* standard of review.

¶ 21    First, we do not consider the common word "uses" in the aggravated assault statute ambiguous. Generally, courts apply statutory language using its plain and ordinary meaning, which may be determined from a dictionary absent a statutory definition. *People v. McChriston*, 2014 IL 115310, ¶ 15. Applying a dictionary definition, "use" is the "application or employment of something." Black's Law Dictionary 1577 (8th ed. 2004). To use is "[t]o bring or put into service;

employ." American Heritage Dictionary 1331 (2nd College Ed. 1985). We can apply this clear and unambiguous statutory language without resorting to further aids of statutory construction and without reading into the statute exceptions, limitations, or conditions not expressed. *People v. Schoonover*, 2021 IL 124832, ¶ 39; *McChriston*, 2014 IL 115310, ¶ 15.

¶ 22    Limiting "use" of a deadly weapon to drawing, brandishing, or pointing, as Astalus suggests, would improperly impose conditions or restrictions absent from the statutory language. See *Schoonover*, 2021 IL 124832, ¶ 39. Because the statute is unambiguous, we determine whether the evidence sufficiently proved that Astalus used a deadly weapon in committing assault, giving the word "uses" its ordinary meaning.

¶ 23    When the issue involves sufficiency of trial evidence, we determine whether, taking the evidence in the light most favorable to the State, a rational trier of fact could find the elements of the crime beyond a reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 25. And the trier of fact need not disregard inferences that flow normally from the evidence, nor seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *Id.* at ¶ 41. In other words, the State need not disprove or rule out all possible factual scenarios. *Newton*, 2018 IL 122958, ¶ 27.

¶ 24    Moreover, a single witness's positive and credible testimony may sustain a conviction even where the defendant offers contrary evidence. *People v. Harris*, 2018 IL 121932, ¶ 27. We reverse a conviction only when the evidence appears so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Cline*, 2022 IL 126383, ¶ 25.

¶ 25    A person commits assault when "he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery," which is either "bodily harm" or

"physical contact of an insulting or provoking nature." 720 ILCS 5/12-1(a), 12-3(a) (West 2020). "A person commits aggravated assault when, in committing an assault, he or she *** [u]ses a deadly weapon *** or any device manufactured and designed to be substantially similar in appearance to a firearm, other than by discharging a firearm." *Id.* § 12-2(c)(1).

¶ 26     After reviewing the trial evidence in the light most favorable to the State, we find that a reasonable trier of fact could conclude that Astalus used a deadly weapon in committing aggravated assault. The record shows Astalus reached behind, removed the loaded clip of an operable firearm and then displayed the loaded clip to Siegler, as he threatened to "shoot this place up." Siegler, a gun owner, heard the distinctive sound of a clip being removed from a firearm and could "clearly" see bullets in the clip Astalus placed before him. Astalus never pointed the gun at anyone, nor did he show the entire gun to Siegler. But, the gun was in his waistband behind his back, capable of being made operable in a moment.

¶ 27     Here, a rational trier of fact could find that Astalus used a deadly weapon to commit aggravated assault. Astalus told Siegler he would "shoot this place up." He emphasized his words by reaching behind, placing the clip on Siegler's desk where he could see bullets, and pocketing or concealing the clip. In doing so, Astalus manifested to Siegler that he had a loaded gun close at hand with which he potentially could carry out his threat.

¶ 28     We find that Astalus *used* a deadly weapon to commit aggravated assault. He employed the loaded clip to convey to Siegler the earnestness of his threat. Stated differently, he put the loaded clip into service to place Siegler in reasonable apprehension of bodily harm, presumably to induce the car's return as he repeatedly demanded. Astalus's words and actions with the gun reinforced each other, making the threat more powerful and credible.

¶ 29    Nevertheless, Astalus argues that "the act of removing the magazine from a firearm is inconsistent [with] the idea that the firearm was used to commit an assault." But, we do not have to elevate to reasonable doubt the prospect that Astalus displayed the clip to Siegler to defuse the situation or convey that he was not a threat because the gun was momentarily inoperable. *Cline*, 2022 IL 126383, ¶ 41 (not required to elevate to reasonable doubt all possibilities favorable to defendant). Were his intent otherwise, he could have left the entire gun concealed and not removed the bullet-loaded clip and uttered a threat to "shoot this place up." A reasonable inference from the State's evidence is that Astalus threatened bodily harm and that his actions with the gun corroborated rather than contradicted his words. Faced with Astalus's threatening words and the display of a vital piece of a firearm, with the knowledge that it could be quickly rendered operable, a reasonable person would consider himself or herself threatened with bodily harm by a deadly weapon, even if the entire gun was not drawn, brandished, or pointed at them.

¶ 30    Affirmed.