# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *In re Julie M.*, 2019 IL App (4th) 180753

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* JULIE M., a Person Found Subject to Involuntary Admission (People of The State of Illinois, Petitioner-Appellee, v. Julie M., Respondent-Appellant). |
| District & No. | Fourth District<br>No. 4-18-0753 |
| Filed<br>Rehearing denied | December 20, 2019<br>January 1, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 18-MH-17; the Hon. Jason M. Bohm, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Veronique Baker and Matthew Davison, of Illinois Guardianship & Advocacy Commission, of Hines, for appellant.<br><br>Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE KNECHT delivered the judgment of the court, with
                          opinion.
                          Justices Turner and Harris concurred in the judgment and opinion.


                                        **OPINION**


¶ 1        In October 2018, the circuit court found respondent, Julie M., subject to involuntary
           admission on an inpatient basis. Respondent appeals the order, arguing the court erred in
           denying her motion to dismiss the State's petition for involuntary admission as untimely filed
           in violation of sections 3-604 and 3-610 of the Mental Health and Developmental Disabilities
           Code (Mental Health Code) (405 ILCS 5/3-604, 3-610 (West 2016)). More specifically,
           respondent contends the facility in which she received both medical treatment and psychiatric
           treatment was a "mental health facility" that failed to comply with the admission requirements
           of the Mental Health Code and, as a result, held and treated her involuntarily for longer than
           the 24-hour period in which a petition for involuntary admission should have been filed.
           Respondent argues that the admission requirements of the Mental Health Code should have
           been complied with when her psychiatric treatment began, not when she was medically
           discharged. Respondent also contends that the circuit court erred when it found, under *In re
           Linda B.*, 2017 IL 119392, 91 N.E.3d 813, that she had the burden of establishing the
           psychiatric treatment she received was imposed involuntarily. Respondent concedes the issue
           is moot but argues her appeal falls within the capable-of-repetition-yet-avoiding-review and
           public-interest exceptions to the mootness doctrine. We affirm.


¶ 2                                    I. BACKGROUND
¶ 3        On October 5, 2018, a petition for involuntary admission under section 3-601 of the Mental
           Health Code (405 ILCS 5/3-601 (West 2016)) was filed on behalf of respondent, a patient in
           the cardiovascular unit of Carle Foundation Hospital (Carle). According to the petition,
           respondent suffered mental illness and needed immediate hospitalization to prevent harm to
           herself or others. Among the allegations in the petition is the allegation respondent refused
           treatment or failed to adhere adequately to prescribed treatment because of the nature of her
           illness. The petition further indicated respondent, in a short period of time, twice received
           treatment at Carle following suicide attempts:

                "[Respondent] arrived via [emergency medical services] after a suicidal attempt on
                9/14/18. She intentionally ingested 2 AAA batteries and 1 button battery. She has
                expressed suicidal ideation numerous times during this hospitalization. She reported
                that she went home from inpatient psychiatric hospitalization, became suicidal again,
                and intentionally swallowed batteries again with the expressed intent of committing
                suicide. During this hospitalization, she attempted to harm herself with a piece of
                plastic cup and trauma shears. She tried to grab for the badge with expressed intent of
                harming herself. She told [a registered nurse] that 'I just NEED to cut.' "

¶ 4        A disposition report, authored by Benjamin Gersh, M.D., a consult liaison psychiatrist at
           Carle, was filed with the circuit court on October 9, 2018. According to the report, respondent
           was 36 years old and had resided in a supportive living residence in Champaign, Illinois. On
           August 29, 2018, respondent presented to the emergency room for a "panic attack." While

awaiting transportation to an inpatient psychiatric facility, respondent swallowed two batteries from a television remote control. At that point, respondent was admitted to Carle and underwent a procedure to remove the battery that did not pass on its own. The psychiatry department consulted with respondent on August 30, 2018, and recommended inpatient psychiatric treatment. On September 7, 2018, respondent was discharged to "OSF 5-East inpatient psychiatric unit" (OSF). While in OSF, respondent was diagnosed with unspecified bipolar disorder, post-traumatic stress disorder, and borderline personality disorder. She was prescribed multiple medications. Three days after her admission, respondent was discharged from OSF. Respondent denied having suicidal ideations on the date of discharge.

¶ 5 According to the report, on September 14, 2018, respondent arrived at Carle's emergency department after having swallowed two AAA batteries and one button battery. She was taken to the operating room for an endoscopy procedure. One battery was found in the esophagus. The next day, an endoscopy was performed but no battery was recovered. On September 20, 2018, respondent underwent a colonoscopy for the removal of the remaining two batteries. Doctors found ulcerated areas, possibly due to battery liquid. Because of these injuries, surgical personnel were consulted. On September 21, 2018, surgery was performed, opening respondent's colon. Three eroded areas and the remaining battery were found.

¶ 6 Dr. Gersh stated that the psychiatry department consulted with respondent on September 17, 2018, and saw her regularly: "9/19, 9/26, 10/1, 10/2, 10/4, 10/5." Respondent attempted to hurt herself multiple times with anything she could find in her room. Because of these episodes, respondent "required two sitters." Dr. Gersh reported "[b]ecause of her high acuity, interdisciplinary team meetings [were held] and a behavioral plan was initiated. The first one was on 10/4." Dr. Gersh completed the involuntary certificate on October 4, 2018.

¶ 7 Dr. Gersh further reported on respondent's lengthy psychiatric history:

"Up until this current Carle admission on 9/14, she had been living at Eden Supportive Living. She does not appear to have this option anymore. She has been diagnosed with Borderline personality Disorder; along with major Depressive Disorder, Anxiety Disorder, Bipolar Disorder. She has a long[-]standing history of swallowing objects and cutting. ***

I saw her when she was at The Pavilion from 4/13 through 5/21/18. She was there for more than a month and was transferred to McFarland State Psychiatric Facility. During that admission, she swallowed a battery there [and was sent] to the Carle [emergency department], in which an EGD was performed to remove the battery. ***

From 11/2 through 11/5/2017, she was at Trinity Regional Medical Center after putting a pencil into her vagina and bladder. She was sent to an inpatient psychiatric unit. On 11/14/17, she was threatening to overdose on pills or insert objects into her vagina. She was sent to Gateway. On 12/7/2017, she broke off a plastic spoon piece into her vagina—she wanted to cut her insides. *** It looks like she was in McFarland as well in September 2017. In June 2017, she ingested batteries and went to a psych unit as well."

¶ 8 The disposition report indicated that changes in respondent's psychiatric medications occurred while she was in Carle. When she was discharged from OSF, respondent was on five psychiatric medications. As of the date of the disposition report, respondent had been taking seven.

¶ 9         On October 16, 2018, respondent moved to dismiss the petition for involuntary admission. Respondent alleged she was admitted to Carle on September 14, 2018, and treated for the ingestion of batteries and injuries caused by the batteries. Respondent maintained she was medically cleared and fit for transfer to an inpatient psychiatric facility on September 28, 2018, but she remained involuntarily detained by Carle. Because, respondent argues, she was held more than 24 hours without proper documentation, which was not filed until October 4, 2018, she was entitled to release under sections 3-604 and 3-610 of the Mental Health Code.

¶ 10        Two days later, the circuit court held a hearing on respondent's motion to dismiss and the State's petition for involuntary admission. Respondent initially called Dr. Gersh to testify. In his role as consult liaison psychiatrist, Dr. Gersh and his team saw patients who "tried to hurt themselves or [were] psychotic or [had] psychiatric presentations of medical complications." Carle did not have a psychiatric ward but treated psychiatric conditions. Dr. Gersh testified his team included Joseph Corbett, a nurse practitioner who was working on his psychiatric certification. After respondent's September 14, 2018, admission to Carle, Corbett did not visit with respondent until September 17, 2018.

¶ 11        Dr. Gersh agreed with Corbett's note recommending, on October 2, 2018, that respondent not be allowed to leave the facility against medical advice (AMA). The note meant that if respondent "expressed a desire to leave, *** then we would have been involved." Dr. Gersh explained "usually if somebody's trying to leave [AMA] and it's somebody who's tried to kill themselves, if they're trying to leave, they will call us immediately to come in and do a decisionality examination on said person."

¶ 12        Respondent next called Corbett to testify. Corbett was asked if respondent was willing to go to an inpatient psychiatry unit voluntarily. Corbett responded, "[D]uring this entire admission, she has all but—she even noted that, yeah, she's been voluntary this—for this stay, she's been voluntary to go to in-patient psychiatric hospitalization." However, when asked if respondent, on September 26, 2018, told him "she would be willing to go to in-patient—an in-patient psychiatric hospital or unit voluntarily," Corbett replied the record "doesn't say."

¶ 13        Corbett testified that, during an October 1 meeting, respondent reported she and her mother were looking at a homeless shelter in which respondent could reside. Respondent was "[t]ired of being stuck in the hospital." Corbett noted that day that respondent stated, "she was just healing and waiting—just waiting for placement; specifically, regarding in-patient psychiatric hospitalization." Corbett noted respondent should not be permitted to leave AMA, calling it standard protocol for patients who have demonstrated a risk to themselves. Corbett met with respondent again on October 2, and she told him to leave her room. Corbett complied and did not assess her that day. No notation that day was made on the record showing whether respondent voluntarily accepted treatment.

¶ 14        Renato Alcaraz Jr., an internal medicine hospitalist, testified that he treated respondent at Carle during the period of September 25-30, 2018. Dr. Alcaraz explained respondent was admitted to Carle for the ingestion of three batteries, one of which had to be retrieved via surgery. Laparoscopic surgery was planned, but, due to the inability to locate the battery, an open procedure was performed. While Dr. Alcaraz treated respondent, she was a patient on the medical floor. Respondent had postoperative abdominal pain. The incision had staples and was healing well. Respondent demonstrated no worrisome signs or symptoms around the surgical site. Her vital signs were relatively unremarkable. On September 28, 2018, Dr. Alcaraz's department determined that respondent was medically stable. During his time treating

respondent, Dr. Alcaraz did not expressly find respondent "medically stable for discharge." Respondent's counsel asked if Dr. Alcaraz required a patient's staples to be removed before the patient is discharged from the hospital. Dr. Alcaraz agreed "there was no conversation about preventing her from being discharged at that point from a medical standpoint." "[F]rom the 28th of September through the 30th of September," he was "of the opinion [respondent] was medically stable for discharge."

¶ 15    Kima Carroll, a registered nurse with Carle, testified she received a message that respondent was determined to be medically stable for discharge on September 28, 2018. Upon receiving such a determination, Carroll reviewed the institutions to which referrals could be sent. In respondent's case, there were seven or eight institutions listed. Carroll sent necessary information to each of these institutions and followed up with them on September 29.

¶ 16    At the close of respondent's evidence, the State called Dr. Gersh to testify. The State began questioning Dr. Gersh by asking if he had an opinion as to when respondent was discharged from Carle. Dr. Gersh responded that he felt "she was medically appropriate for transfer to a psych unit on [October 4, 2018]." The term "medical appropriateness" differed from "medical stability." His decision was based on when respondent's staples were removed. Dr. Gersh explained respondent tended "to swallow things, so having staples *** in somebody who swallows foreign objects is concerning and she had some serosanguineous leakage from her wound." Because the local psychiatric facilities were not comfortable accepting "medically complicated people," it was inappropriate to discharge respondent until October 4, 2018. She had nowhere to go. Respondent's previous facility would not accept her. Her mother was attempting to find respondent a homeless shelter to reside in. In Dr. Gersh's opinion, respondent's "going to a homeless shelter [was] unacceptable." Respondent's staples were removed on October 3, 2018. The next day, she was discharged by the resident, which marked the end of her medical stay and respondent transitioned to a "psych stay."

¶ 17    At the close of the evidence, the circuit court opined, under the Illinois Supreme Court's decision in *Linda B.*, that respondent had the burden of showing she did not voluntarily receive psychiatric services. The court denied respondent's motion to dismiss and granted the State's petition for involuntary admission upon concluding, in part, that respondent failed to show her psychiatric treatment was involuntary:

    "The more difficult question is, whether that certification on October the 4th was timely done. The law requires that someone who's being held involuntarily must—the certificate must be filed within 24 hours. She was medically there because of a surgery to remove a battery. The surgery took place on September the 21st. She was then [seen] by Dr. Alcaraz from the 25th to the 30th. It was his opinion that she was medically stable and could be discharged, I believe he testified to, on the 28th.

    But, he also testified that he co-managed her care with both psychiatry and surgery. And Dr. Gersh testified, the evidence before the Court is that Dr. Gersh testified that she was medically discharged on the 3rd—October the 3rd. The question is whether she—whether prior to that discharge on October the 3rd, her legal status changed; that is, it went from being voluntarily in the hospital to involuntarily in the hospital.

    And it's—it is the Respondent's burden to establish that she was involuntarily there. The testimony and the evidence in this case is that she wanted to leave the hospital, there's no question about that. But, wanting to leave the hospital, is that the same as being involuntarily in the hospital? Dr.—not Dr.—nurse practitioner Corbett

testified that she wanted to leave but that she was responsive to him telling her that she wasn't—it wasn't appropriate for her to leave the hospital yet. That she needed placement before leaving the hospital. I think—I haven't seen anything that suggests, that demonstrates in the court's mind that she's met her burden that she was involuntarily in the hospital. The fact that she didn't want to be there is true of every person, I think, in the hospital. That doesn't mean they're involuntarily there. So—and I'm basing that decision on the reading of both [*Linda B.*] and [*In re Andrew B.*, 386 Ill. App. 3d 337, 896 N.E.2d 1067 (2008)], and it's in the *Andrew B.* case that it appears the Court adopted a fairly technical definition of admission. The Court said that physical presence in a hospital or even a mental health facility does not mean that you're involuntarily there. People can be there for a variety of reasons. And it's only when that becomes involuntarily so, which in this case once she was discharged from the hospital, then she would be admitted under the—once she was medically discharged from the hospital on October 3rd, that is when the Court finds she was admitted for purposes of the Act. The certificate was filed within 24 hours of that, so the motion to dismiss will be denied."

The circuit court ordered respondent be hospitalized at McFarland Mental Health Center and Carle and the period of hospitalization not exceed 90 days.

¶ 18    This appeal followed.

¶ 19                                II. ANALYSIS
¶ 20                                A. Mootness
¶ 21    As both parties agree, this appeal is moot because respondent's underlying 90-day admission period expired. See *In re Andrew B.*, 237 Ill. 2d 340, 346, 930 N.E.2d 934, 938 (2010). Respondent argues that this court may nevertheless consider her appeal pursuant to an exception to the mootness doctrine. Respondent points to two exceptions she contends apply to this appeal: (1) the capable-of-repetition-yet-evading-review exception (*In re Benny M.*, 2017 IL 120133, ¶ 19, 104 N.E.3d 313) and (2) the public interest exception (see *Linda B.*, 2017 IL 119392, ¶ 19). The State disagrees, maintaining neither exception applies.

¶ 22    There are two elements to the capable-of-repetition-yet-evading-review exception: (1) the duration of the challenged action must be too short to be fully litigated before its end and (2) a reasonable expectation the same complainant will again be subject to the same action. *Benny M.*, 2017 IL 120133, ¶¶ 19-20. This exception applies when resolution of the issue would likely affect a future case involving the same respondent. *In re Alfred H.H.*, 233 Ill. 2d 345, 359, 910 N.E.2d 74, 82 (2009).

¶ 23    Here, the 90-day duration is too short to allow review on appeal. The first element is met. *Benny M.*, 2017 IL 120133, ¶ 19. As to the second element, respondent argues her history establishes a reasonable expectation she will be subject again to the same conduct by Carle. Respondent emphasizes that within days of being discharged from Carle for swallowing batteries, she returned to Carle for a suicide attempt swallowing batteries. Respondent further maintains, as here, there is no indication Carle complied with the Mental Health Code during her earlier stay.

¶ 24    The State disagrees, arguing a decision in this case would have no effect on a future case, if any, involving respondent. According to the State, if respondent is admitted for medical

treatment and refuses mental health treatment, she need only request discharge, which would trigger Carle to either discharge respondent or pursue an involuntary admission under the Mental Health Code. The State contends we need not resolve the appeal as respondent can avail herself of the protection of the Mental Health Code, and any failure to do so would be on respondent.

¶ 25     This appeal involves the interpretation of the Mental Health Code and a determination of whether its protections apply to a patient who is receiving simultaneous medical care and psychiatric treatment in a place deemed a "mental health facility." In support of its contentions in this appeal, the testimony and the State's arguments demonstrate that Carle believed it need not comply with the statutory voluntary or involuntary admission requirements under the Mental Health Code before providing inpatient psychiatric treatment to respondent because respondent had been admitted as a medical patient. Given respondent's history, there is a reasonable expectation she will return to Carle in need of simultaneous medical and psychiatric treatment again. A decision on the merits will affect how respondent is treated when in Carle, or a similar institution, again for both medical and psychiatric conditions. A resolution of this issue will likely have some bearing on future litigation involving respondent. See *Alfred H.H.*, 233 Ill. 2d at 360. Both requirements of the mootness exception for issues that are capable of repetition yet evading review are met here.

¶ 26                                B. Statutory Authority

¶ 27     The Mental Health Code is the exclusive means by which a person who is mentally ill may be admitted to a mental health facility. *In re Gardner*, 121 Ill. App. 3d 7, 10, 459 N.E.2d 17, 20 (1984); see 405 ILCS 5/3-200(a) (West 2016) ("A person may be admitted as an inpatient to a mental health facility for treatment of mental illness only as provided in this Chapter ***."). Its "elaborate and complex system of procedures" were designed to protect the rights of those with mental illness. *Gardner*, 121 Ill. App. 3d at 10.

¶ 28     The Mental Health Code provides two means for voluntary admission to a mental health facility for treatment of mental illness, each with different consequences for the facility and the patient. An "informal admission" is authorized upon a patient's "request without making formal application therefor if, after examination, the facility director considers that person clinically suitable for admission upon an informal basis." 405 ILCS 5/3-300(a) (West 2016). If a recipient is admitted informally, the facility must inform him or her "in writing and orally at the time of admission of his right to be discharged from the facility *at any time* during the normal daily day-shift hours of operation." (Emphasis added.) *Id.* § 3-300(b). The facility also must determine whether a potential recipient is clinically appropriate for such an admission. See *id.* § 3-300(a), (c).

¶ 29     The second means is governed by section 3-400 of the Mental Health Code, for the "[v]oluntary admission to mental health facility." *Id.* § 3-400. The requirements for this type of admission are more rigorous. Under section 3-400(a), a person

"may be admitted to a mental health facility as a voluntary recipient for treatment of a mental illness upon the filing of an application with the facility director of the facility if the facility director determines and documents in the recipient's medical record that the person (1) is clinically suitable for admission as a voluntary recipient and (2) has the capacity to consent to voluntary admission." *Id.* § 3-400(a).

To be found to have capacity, the recipient must be able to understand he or she may request discharge at any time and the discharge "is not automatic." *Id.* § 3-400(b)(2). Upon a written request for discharge, the facility must, within five business days, discharge the recipient or initiate commitment proceedings. *Id.* § 3-400(b)(3).

¶ 30       Involuntary admissions are authorized by section 3-600 of the Mental Health Code: "A person 18 years of age or older who is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization may be admitted to a mental health facility pursuant to this Article." *Id.* § 3-600. Section 3-601(a) mandates that a petition be filed with a facility director of a mental health facility. *Id.* § 3-601(a). Section 3-602 requires that the petition be accompanied by a certificate stating the respondent is subject to involuntary admission on an inpatient basis and requires that the immediate hospitalization be signed by a "physician, qualified examiner, psychiatrist, or clinical psychologist" who examined the respondent not more than 72 hours before admission. *Id.* § 3-602.

¶ 31       Section 3-604 sets a deadline for the filing of a petition for involuntary admission—a deadline that is at issue in this case:

> "No person detained for examination under this Article on the basis of a petition alone may be held for more than 24 hours unless within that period a certificate is furnished to or by the mental health facility. If no certificate is furnished, the respondent shall be released forthwith." *Id.* § 3-604.

¶ 32       Additional safeguards during the involuntary admission process are provided in the Mental Health Code. For example, section 3-206 requires the facility director of the mental health facility to provide the address and phone number of the Guardianship and Advocacy Commission when "a person is admitted or objects to admission, and whenever a recipient is notified that his legal status is to be changed." *Id.* § 3-206. Section 3-208 provides that when a certificate must be filed for involuntary admission, the individual conducting an examination must inform the person being examined of the purpose of the examination, his or her right not to talk to the examiner, and that any statements made may be used at a court hearing on the issue of whether he or she is subject to involuntary admission. *Id.* § 3-208. Moreover, section 3-202(a) mandates that mental health facilities maintain adequate records regarding a patient's admission and change in status. *Id.* § 3-202(a).

¶ 33                                    C. *In re Linda B.*

¶ 34       Central to the resolution of this matter is the supreme court's decision in *Linda B.* In that case, like here, the respondent arrived "at the hospital with interrelated psychiatric and medical problems," received psychiatric treatment while having been admitted medically, and was subject to a petition for involuntary admission to a mental health facility. *Linda B.*, 2017 IL 119392, ¶¶ 3, 5, 20. Given the factual similarities of the two cases and the precedential authority of the supreme court's opinion, a summary of *Linda B.* is appropriate for resolution of this appeal.

¶ 35       In *Linda B.*, the respondent was admitted to a medical floor at Mt. Sinai Hospital (Mt. Sinai) on April 22, 2013, where she also received psychiatric treatment. *Id.* ¶ 5. On May 9, 2013, the mental health facility director at Mt. Sinai filed a petition seeking the involuntary admission of the respondent to a treatment facility. *Id.* ¶ 3. Supporting the petition were certificates showing respondent was mentally ill and immediate hospitalization was necessary

to prevent harm to the respondent or others. *Id.* ¶ 4. The respondent suffered paranoid delusions, refused medical and psychiatric medications, and was violent with medical staff. *Id.*

¶ 36 At the June 11 hearing on the petition for involuntary commitment, a psychiatrist testified the respondent received treatment for both medical and psychiatric conditions. *Id.* ¶¶ 5-6. The respondent had been admitted to Mt. Sinai earlier that same year " 'with similar presentation.' " *Id.* ¶ 6. When asked on cross-examination if the respondent was recommended for nursing home placement due to mental health reasons or medical reasons, the psychiatrist stated the respondent's mental health conditions prevented her from taking care of her medical condition. *Id.* ¶ 8.

¶ 37 When asked if a May 28, 2013, note by the psychiatrist indicated the respondent was ready for discharge from Mt. Sinai, the psychiatrist responded that the respondent was on the medical floor waiting to be admitted to a nursing home and did not need to be transferred to an inpatient psychiatric unit. *Id.* ¶ 9. The respondent needed a one-to-one sitter while on the medical floor. *Id.*

¶ 38 After the State rested on its petition for involuntary admission, the respondent's counsel moved to dismiss the petition based on the fact that the petition was filed well beyond 24 hours after the respondent's admission, when respondent was admitted to the medical floor of Mt. Sinai on April 22, 2013, but was also treated psychiatrically. *Id.* ¶ 10. The State was permitted to reopen its case to present evidence as to the motion to dismiss. *Id.* ¶ 11. The psychiatrist testified " '[w]e don't submit any petitions for any other patients unless we start believing that patients need, either psychiatric admission or [a] patient needs treatment against their will.' " *Id.*

¶ 39 The circuit court denied the motion to dismiss and granted the State's petition for involuntary admission. *Id.* ¶¶ 12-13. On appeal to the First District Appellate Court, the judgment of the circuit court was affirmed. *Id.* ¶ 15. Of note, the First District concluded "the medical floor of the hospital, arguably, was not a 'mental health facility' within the meaning of the statute, irrespective of whether psychiatric treatment was rendered there." *Id.* (citing *In re Linda B.*, 2015 IL App (1st) 132134, ¶ 23, 29 N.E.3d 406).

¶ 40 The Illinois Supreme Court observed the appeal before it focused on two questions. The first was whether Mt. Sinai's medical floor qualified as a "mental health facility" under the Mental Health Code. The second was what constitutes an admission under section 3-611 (405 ILCS 5/3-611 (West 2016)), which mandates, " '[w]ithin 24 hours, excluding Saturdays, Sundays and holidays' " after a respondent's involuntary admission, the facility director must file, in part, a petition, certificates, and proof of service of the petition and a statement of rights to the respondent. *In re Linda B.*, 2017 IL 119392, ¶¶ 26, 28.

¶ 41 In consideration of the first question, our supreme court observed that the "respondent's psychiatric treatment and supervision on the medical floor were at least as comprehensive and structured as anything she might have received in the psychiatric unit." *Id.* ¶ 36. Our supreme court concluded "[i]n those instances in which a facility or section of a facility provides psychiatric treatment to a person with mental illness—as was the case here—it qualifies as a 'mental health facility' for purposes of the Mental Health Code's application." *Id.* ¶ 37. In reaching this decision, the court noted its repeated acknowledgements that "the administration of involuntary mental health services involves a 'massive curtailment of liberty.' " (Internal quotation marks omitted.) *Id.* ¶ 38 (quoting *In re Robert S.*, 213 Ill. 2d 30, 46, 820 N.E.2d 424, 434 (2004), quoting *In re Barbara H.*, 183 Ill. 2d 482, 496, 702 N.E.2d 555, 561 (1998),

quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)). And it further observed that the purpose of the Mental Health Code's "procedures is to provide adequate safeguards against unreasonable commitment." *Id.* The court observed "one might well understand how a patient could be treated psychiatrically, involuntarily, in facilities not specifically designated as 'mental health facilities' and thus be deprived of the Mental Health Code's safeguards." *Id.* ¶ 39.

¶ 42    While noting the respondent could well have been deprived of the Mental Health Code's safeguards, the court ultimately ruled against the respondent, after observing it did not "*know*" she was so deprived as the record did not show before the petition was filed the respondent was an involuntary recipient of psychiatric services at Mt. Sinai. (Emphasis in original.) *Id.* ¶ 40. The court focused on the absence in the record of the capacity in which respondent was admitted, as either a voluntary or involuntary recipient of treatment. *Id.* ¶ 41. The court observed that the record only demonstrated "bare-bones evidence of physical admission to the hospital, with some evidence of communication between hospital personnel and unidentified family members of [the] respondent." *Id.* ¶ 42. This bare-bones evidence suggested the respondent may have been persuaded to go to the hospital voluntarily and treatment may have been consensual. *Id.*

¶ 43    The *Linda B.* court then held it was the respondent's burden to show she was in the hospital involuntarily. *Id.* ¶ 43. The court concluded so upon citing case law related to an appellant's burden on appeal:

> "It is well established that, on appeal, the party claiming error has the burden of showing any irregularities that would justify reversal. [Citation.] Error is never presumed by a reviewing court; it must be affirmatively shown by the record. [Citation.] It is the appellant's burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and any doubts that may arise from the incompleteness of the record will be resolved against the appellant." *Id.*

¶ 44    The court then held the respondent failed to meet that burden. *Id.* ¶ 49. The court observed that to establish the filing of the petition was untimely, the respondent had to show the initial period of hospitalization and psychiatric treatment was involuntary, which the record did not show. *Id.* ¶ 44.

¶ 45    Citing *Andrew B.*, the *Linda B.* court acknowledged the legal status of a voluntary recipient of mental health services may change while one is in a mental health facility. *Id.* ¶¶ 48-49. Having found the respondent failed to demonstrate her entry to the facility or her initial treatment was involuntary, she failed to demonstrate error occurred. *Id.* ¶ 49. The court affirmed the involuntary admission of the respondent. *Id.* ¶ 51.

¶ 46                                              D. Merits

¶ 47    Respondent argues the petition for involuntary admission was untimely. According to respondent, *Linda B.* establishes Carle, in its psychiatric treatment of her, was a mental health facility as defined by the Mental Health Code. As such, respondent argues, Carle was required to comply with the Mental Health Code's mandates regarding admission and it failed to do so, resulting in her confinement and psychiatric treatment without the provision of the safeguards of the Mental Health Code. Respondent emphasizes she was admitted for a suicide attempt on September 14, 2018, and the record shows psychiatric treatment began no later than September 17, 2018. Not until October 4, 2018, well beyond the statutory 24-hour mandate, according to respondent, did Carle file the petition for respondent's involuntary commitment.

- 10 -

¶ 48 The State frames the initial question to be resolved on appeal as "whether a facility must comply with the admission procedures of the [M]ental [H]ealth [C]ode in order to provide mental health treatment to an individual that is already admitted to the facility for medical treatment." The State argues the facility does not. While conceding Carle "appears to be" a mental health facility, the State argues respondent was not admitted to Carle for mental health treatment but for medical treatment of the physical injuries resulting from the ingestion of three batteries. The apparent triggering event for its need to comply with the Mental Health Code's admission was, according to the State, the determination respondent was ready to be discharged *medically*. Under this argument, the State maintains it was not until October 3, 2018, when respondent was discharged medically, that Carle had to proceed for an involuntary admission.

¶ 49 We agree with respondent that the Mental Health Code requires facilities that provide mental health treatment, *i.e.*, mental health facilities, comply with the Mental Health Code's admission procedures, even if a recipient has already been admitted to the facility for medical treatment. *Linda B.* involves a similar respondent, one admitted to an emergency department of a hospital while presenting with medical and psychiatric conditions. *Id.* ¶ 5. The resolution of that appeal establishes that a facility providing mental health treatment to patients must comply with the Mental Health Code, even when that facility is also providing medical treatment. No exception to the Mental Health Code was carved out for patients, like *Linda B.*'s respondent, who had been admitted for medical reasons. Indeed, such an exception would undermine the holding of *Linda B.*, as the question of timeliness would have readily been resolved with the recognition the respondent was being treated medically and, therefore, no petition for involuntary admission would have been required.

¶ 50 The exception suggested by the State would result in the unusual scenario where psychiatric patients with no medical conditions are entitled to the protections of the Mental Health Code, while psychiatric patients for whom the severity of their mental illness results in self-harming or suicide attempts are not entitled to the same protections when being treated for physical injuries related to or caused by their mental illness. A mental health facility cannot hide behind a "medical care" shield to permit it to provide mental health services without the protections of the Mental Health Code and deny protections of the Mental Health Code to those patients who most need it.

¶ 51 We further reject the State's contention that "[i]t would be absurd, unjust, *and* inconvenient to require treatment facilities to comply with the admission requirements of the [M]ental [H]ealth [C]ode every time an individual who has already been admitted for medical treatment also wants to receive mental health treatment." (Emphasis in original.) Such an assertion belies the purpose of the Mental Health Code and the legislature's intent to safeguard those subjected to or seeking inpatient mental health treatment. If facilities that fall within the definition of "mental health facility" want to provide inpatient psychiatric treatment, it is not absurd, unjust, or inconvenient to expect those facilities to comply with the admission procedures and thus ensure its patients are voluntarily receiving services or must be subjected to involuntary commitment. Here, although respondent was receiving medical treatment due to the physical injuries resulting from the ingestion of batteries, she was also subjected to significant psychiatric treatment, which included consultations with a psychiatric team, "sitters," and psychotropic medications. She was entitled to the protections of the Mental Health Code.

¶ 52        The State further contends we must affirm the circuit court, as respondent, like the one in *Linda B.*, failed to meet her burden of showing her mental health treatment was involuntary. The State emphasizes respondent could have simply requested discharge or refused treatment, but she did not. Had she done so, according to the State, it could have filed the petition for involuntary admission sooner. However, as she did not, the State contends the petition was not untimely.

¶ 53        Respondent argues the circuit court improperly placed too much emphasis on the latter part of the *Linda B.* decision and found she carried the burden of establishing the treatment was involuntary. Respondent contends that to read *Linda B.* in this manner would undermine the language that expressly found that the Mental Health Code applies to facilities that provide mental health treatment and render the application of its safeguards meaningless.

¶ 54        *Linda B.*'s analysis regarding which party bears the burden of establishing voluntariness or involuntariness is concerning. In *Linda B.*, our supreme court affirmed the denial of the respondent's motion to dismiss upon concluding she failed to meet the burden of establishing her physical entry and initial treatment were involuntary. *Id.* ¶ 49. Upon finding the respondent carried this burden, the court, while discussing the proceedings in the circuit court, observed: "[i]n order to establish untimely filing of the May 9 petition, [the] respondent had to establish that her initial period of hospitalization and psychiatric treatment was involuntary." *Id.* ¶ 44. While setting forth the respondent's burden in the circuit court, the only analysis of that burden involves consideration of an appellant's burden *on appeal*:

> "It is well established that, on appeal, the party claiming error has the burden of showing any irregularities that would justify reversal. [Citation.] Error is never presumed by a reviewing court; it must be affirmatively shown by the record. [Citation.] It is the appellant's burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and any doubts that may arise from the incompleteness of the record will be resolved against the appellant." *Id.* ¶ 43.

No analysis was provided as to whether the recipient of mental health treatment or the provider of said treatment would carry this burden before the circuit court. The *Linda B.* court did not address the procedural process or burden shifting that might result from the filing of a petition for involuntary admission and a subsequent motion to dismiss. Nor did the court weigh policy considerations in the determination of which party should shoulder that burden, whether it be the mental health patient whose conditions are of such severity as to warrant a petition for involuntary commitment or the mental health facility that could secure proof of voluntariness by complying with the Mental Health Code, which obligates such facilities to (1) provide the application and accept or decline it based on the applicant's capacity (405 ILCS 5/3-400, 3-401(b), 3-405(a) (West 2016)), (2) permit discharge or file an involuntary petition (*id.* § 3-400(b)), (3) maintain appropriate documentation (*id.* § 3-202(a)), and (4) seek an affirmance of a voluntary recipient's status after 30 days (*id.* § 3-404).

¶ 55        Whatever the analysis, we are bound by the supreme court's holding that respondent carried the burden of showing her admission and treatment were involuntary. Respondent has argued she has done so. Respondent emphasizes the absence of any documentation filed by Carle seeking her admission until after her medical discharge. However, that fact also existed in *Linda B.* See *Linda B.*, 2017 IL 119392, ¶ 41. Respondent emphasizes that her treatment included "sitters" and daily contact with psychiatric treatment providers. Those facts, too, existed in *Linda B.* See *id.* ¶¶ 4-5, 7. The facts that she would not speak to Corbett on one day,

she no longer wanted to be in the hospital, and the absence of any notation of "voluntary treatment" in Corbett's notes do not establish that respondent was involuntarily receiving psychiatric treatment. As in *Linda B.*, there is insufficient evidence to establish her admission and treatment at Carle were involuntary. We must affirm the circuit court's judgment.

¶ 56 While we affirm, we also note that *Linda B.* was decided September 21, 2017. Carle had one year to change its practices and to understand it was a "mental health facility" for purposes of the Mental Health Code and this patient. We conclude it was disingenuous for Carle to argue otherwise. One would hope, in future cases, Carle will strictly observe the admission requirements of the Mental Health Code and not, instead, rely on the individual to raise the issue.

¶ 57                                    III. CONCLUSION
¶ 58 We affirm the circuit court's judgment.

¶ 59 Affirmed.