2021 IL App (1st) 191894-U

No. 1-19-1894

Order filed February 26, 2021

SIXTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| ALMA LASERS, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 L 10486 |
| | ) | |
| YIGAZU ISTHETICS, INC., | ) | Honorable |
| | ) | Daniel J. Kubasiak, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justice Connors and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held:* Trial court did not err in denying defendant's motion to dismiss breach of contract complaint or partially granting plaintiff's motion to dismiss counterclaim. Court did not err in granting summary judgment for plaintiff on its complaint or remaining counterclaims. Court did not err in entering money judgment upon the summary judgment, nor in not vacating the judgment.

¶ 2    This case concerns the sale of laser aesthetics machines or systems by plaintiff Alma Lasers, Inc. to defendant Yigazu Isthetics, Inc. Defendant appeals from orders of the circuit court (1) granting summary judgment for plaintiff in its breach of contract action and on defendant's counterclaims, (2) entering a money judgment upon the summary judgment, and (3) denying

defendant's motion to vacate the judgment. On appeal, defendant contends that the court erred in (1) denying defendant's motion to dismiss the complaint as amended and granting plaintiff's motion to dismiss defendant's fraud counterclaim, (2) granting plaintiff's summary judgment motion, and (3) entering judgment and not vacating it. For the reasons stated below, we affirm.

¶ 3                                          I. JURISDICTION

¶ 4      Upon plaintiff's 2016 breach of contract complaint as amended, and defendant's 2017 counterclaims, the trial court in November 2017 denied a motion to dismiss the amended complaint and partially granted a motion to dismiss the counterclaims without prejudice. The court granted summary judgment for plaintiff on its complaint and the remaining counterclaims on August 19, 2019, and entered judgment for plaintiff for $212,309.55 on August 21, 2019. Defendant filed a motion to vacate the judgment on August 26, 2019, and a notice of appeal on September 18, 2019, and the court denied defendant's motion on September 20, 2019. See Supreme Court Rule 303(a)(2) (eff. July 1, 2017) (notice of appeal filed before disposition of timely postjudgment motion takes effect upon disposition of motion.) Accordingly, this court has jurisdiction in this matter pursuant to article VI, section 6 of the Illinois Constitution and Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017) governing appeals in civil cases.

¶ 5                                          II. BACKGROUND

¶ 6      Plaintiff filed its verified breach of contract complaint in October 2016, alleging that the parties entered into contracts on December 3, 2015, for plaintiff to sell defendant laser equipment or systems, which were described in more detail in two invoices plaintiff sent on December 9, 2015, and plaintiff on or about the invoice date shipped that equipment to defendant. Plaintiff alleged that the contracts and invoices obligated defendant to pay within 90 days of the invoice date, and defendant paid $5000 on each invoice for a total of $10,000 paid. On the 90th day, March 8, 2016, defendant owed on the invoices a total of $130,912 not including interest at the 18%

annual rate in the contracts. Plaintiff sent defendant letters on September 23 and October 16, 2016, requesting payment but defendant made no payment following either letter. Upon these factual allegations, plaintiff alleged that it performed all its duties under the binding contract created by the contracts and invoices while defendant had breached that contract by its nonpayment following demand so that defendant owed plaintiff $130,912 plus $14,911.75 in accrued interest as of October 25, 2016, plus interest accruing thereafter at $64.55 per day.

¶ 7     Attached to the complaint were said contract documents, invoices, and letters. One contract was for a "Soprano" system and the other for a "VShape" system, and both documents bore the apparent signature of Dr. Solomon Yigazu as "owner" of defendant. Both contracts provided:

> "Until [plaintiff] ('Seller') receives and countersign's [*sic*] Buyer's acceptance in writing and in accordance with these terms and conditions, all prices shall be subject to change upon notice to Buyer (notwithstanding the receipt by Seller of the Buyer's deposit). Buyer agrees to make payments in accordance with Seller's payment schedule attached hereto and incorporated herein by reference (the 'Payment Schedule'). Seller shall send invoices for amounts due pursuant to the Payment Schedule. Payment shall be due within seven days after Buyer's receipt of Seller's invoice, unless Seller requires payment in advance. Interest shall be charged al the rate of 18% per year or the highest rale permitted by applicable law, whichever is less, on any invoice more than 30 days past due."

Neither contract document in the complaint had a payment schedule attached. Both stated that each machine required a new password from plaintiff every 30 days, which it would provide if defendant's account had no unpaid past-due balance. The Soprano invoice was for $60,642 and the VShape invoice was for $70,270, with each invoice reflecting a $5000 payment and both invoices stating "Due 90 Days from Invoice."

¶ 8     Defendant appeared in March 2017, and in April 2017 filed a motion to dismiss and a motion for leave to file a counterclaim.

¶ 9     The motion to dismiss cited section 2-619(a)(9) of the Code of Civil Procedure. 735 ILCS 5/2-619(a)(9) (West 2018). It primarily alleged that the sale of the two systems was supposed to be financed according to a payment schedule, but because the parties never agreed to a schedule there was no enforceable contract between them regarding the systems. The motion noted that the complaint did not mention that (1) the machines were locked so that defendant could not use them, or (2) the parties had earlier contracted for the sale of two other systems, but those transactions had payment schedules. Defendant argued that plaintiff's

> "decision to disregard the Payment Schedule provision and invoice for the later two machines, and instead invoice and demand full lump sum amounts within days of a preliminary Terms and Conditions of Sale calling for a Payment Schedule, just as occurred for the first two machines, is invalid and outside the parties established course of conduct."

¶ 10    Defendant alleged that plaintiff's representative Dave "Maslowski emphasized a special promotion, which allowed Yigazu to pay $29/month for six months before regular monthly payments would start for 36, 48, or 60 month terms," and emphasized his "close relationship" with financing company Ascentium Capital as well as generally describing financing as easily obtained. The first two systems were sold in September 2015 upon deposits of "between $5000 and $15,000" total. Payment schedules – $29 monthly for 6 months for each system, then for 48 months $2,698.44 monthly on one system and $2541.62 monthly on the other – were reached by the parties, and defendant made all payments on these two systems. However, the payment schedules did not account for defendant's down payments. Defendant also alleged that plaintiff promised $10,000 in marketing and web-development services that it did not provide.

¶ 11    The motion alleged regarding the two systems at issue in the complaint that the parties discussed financing options but Yigazu signed preliminary contracts for the systems in December 2015 that did not have payment schedules. Plaintiff then invoiced defendant for the full price of the systems with no payment schedule. The machines were delivered locked and, except for a training session by a representative of plaintiff, remained locked since.

¶ 12    Attached to the motion to dismiss, in addition to the contracts and invoices for the systems at issue in the complaint, were September 2015 contracts for the first two systems referenced in the motion, described as a Harmony and a FemiLift, reflecting deposits of $10,000 and $5000 respectively. Also attached was Yigazu's April 2017 affidavit averring in detail the allegations in the motion to dismiss.

¶ 13    Plaintiff responded to the motion to dismiss, arguing that the motion was meritless in alleging an affirmative matter. Because plaintiff filed a verified complaint alleging that contracts existed between the parties and that defendant breached those contracts, while defendant acknowledged signing contract documents and admitted its possession of the systems contracted for, "it is therefore certainly *possible* that [plaintiff] has valid and enforceable contracts." A motion to dismiss accepts the facts alleged in the complaint as true, and a dispute whether a contract exists is not an easily-proven fact appropriate for such a motion.

¶ 14    Defendant replied in support of its motion to dismiss, arguing that the failure to have a meeting of the minds was shown by (1) the documents themselves, referencing a required but nonexistent payment schedule, and (2) the course of dealings between the parties, with their earlier contracts having payment schedules. Defendant argued that Yigazu's affidavit refuted the complaint and was not itself refuted in plaintiff's response, and that failure to satisfy a condition precedent – here, agreeing to payment schedules – is a proper basis for a motion to dismiss.

¶ 15 In June 2017, the court granted the motion to dismiss without prejudice, granting plaintiff time to file an amended complaint. The court noted that the signed agreements provided for payment schedules but did not include them, nor had plaintiff produced any payment schedule, and that Yigazu averred to the machines being locked but plaintiff provided no counteraffidavit.

¶ 16                                    A. Amended Complaint.

¶ 17 Plaintiff filed its amended verified complaint in July 2017. It alleged that the contracts provided for pretax prices of $60,850 for the Soprano system and $69,950 for the VShape system, and for credit for defendant's deposit on its earlier purchase. "Under the terms of the Contracts, and pursuant to the Payment Schedule called for by the Terms and Conditions of Sale," defendant agreed to pay the balance due on the Soprano and VShape systems "in full upon delivery and installation." The invoices reflected taxes and a $5000 credit for each system for defendant's deposit on the earlier purchase. The amended complaint acknowledged the contractual provision for password locking of the machines but alleged that (1) plaintiff provided defendant's employees training on the systems, with "training only possible if [they] are unlocked," and (2) plaintiff provided defendant passwords for the machines through March 15, 2016, based on the 90-day term in the invoices. The amended complaint sought $130,912 plus $31,629.50 in accrued interest as of July 11, 2017, plus interest accruing thereafter at $64.55 per day.

¶ 18 Attached to the amended complaint, in addition to the original attachments, were additional pages of the contracts. The VShape contract included a line item for "Marketing Assistance" for a "Social Media Success Package," initially priced at $5000 but then discounted to zero. The new pages did not include anything labeled a payment schedule but did state "Terms: USD Deposit with Order $10,000. Balance to be paid in full upon delivery" in the Soprano contract and "Terms; USD Deposit with Order $10,000 with balance due upon installation" in the VShape contract, both on pages bearing Yigazu's apparent signature. Also attached to the amended complaint was a copy

of a February 2016 email from an employee of plaintiff instructing defendant on how to "extend the lock on the system" until March 15, 2016.

¶ 19     Defendant filed a motion to dismiss under section 2-619, arguing that the amended complaint "fails to contemplate" that the parties did not agree to lump-sum payment for the two systems. Defendant argued that the additional contract pages did not include a payment schedule for either contract at issue. By contrast, the contracts for the first two systems included payment schedules. Also, the "advertising and representations of the availability of periodic payment financing, and actual extension and execution of periodic monthly financing for earlier transactions combined with its present 'bait-and-switch' attempt to collect full lump-sums from [defendant] is an unlawful trade practice - which should independently nullify the Amended Complaint." Defendant argued that the amended complaint again did not acknowledge that defendant had no use of the two systems at issue as Yigazu averred. The motion to dismiss the amended complaint, in addition to alleging a failed meeting of the minds for an enforceable contract, argued that plaintiff's "bait and switch" violated section 2J of the Consumer Fraud and Deceptive Practices Act (the Act) (815 ILCS 505/2J (West 2018)) and "nullified" the amended complaint.

¶ 20     Plaintiff responded to the motion to dismiss, claiming that the contracts for all four systems were substantively identical. Indeed, the contracts for the first two systems provided for payment on delivery while the Soprano and VShape contracts provided for payment within 90 days. While defendant alleged certain payment schedules for the first two systems, plaintiff claimed that the parties did not agree to those payment schedules. In other words, plaintiff "never extended periodic monthly financing to Dr. Yigazu or [defendant] in prior transactions. Financing for prior transactions was separately arranged by Yigazu himself through Ascentium Capital, an entirely separate entity from" plaintiff. As to the allegation that the parties did not agree to payment schedules for the latter two systems, plaintiff argued that the terms in the contracts – down

payments applied as deposits, with balance due in 90 days from the invoices – were indeed payment schedules. Even if a payment schedule was absent, that would not be the failure of a condition precedent because payment is due on delivery when a sales contract does not address the timing of payments. Also, defendant did not assert this alleged failure of condition precedent while the systems were in its possession, its employees were trained to use them, and it could use them subject to password control but instead waited until plaintiff sued. Plaintiff argued that the motion to dismiss did not accept the allegations of the complaint and plead an affirmative matter to defeat the complaint, as a section 2-619 motion should, but challenged the complaint's allegations. Defendant's claim under the Act would fail because defendant was not misled by plaintiff and because the Act was inapplicable to the transactions between these parties.

¶ 21    The response was supported by Maslowski's affidavit. He averred that, after he and Yigazu met at a 2015 sales presentation, Yigazu contracted with plaintiff on September 12, 2015, to buy the Harmony and FemiLift systems for $97,450 and $95,000 respectively, plus taxes. The payment schedule referenced in both contracts was on both purchase orders: "USD Deposit with order $10,000. Balance to be paid in full upon delivery." However, plaintiff accepted a $5000 deposit on the FemiLift. On September 17, 2015, plaintiff shipped the Harmony system and invoiced defendant for $104,530 including taxes, with payment due in 30 days. On September 29, 2015, plaintiff shipped the FemiLift system and invoiced defendant for $101,524 including taxes, with payment due in 30 days. Defendant received the Harmony system on September 25, plaintiff trained defendant on it on September 30, defendant received the FemiLift system on October 2, and plaintiff trained defendant on it on October 31. Maslowski averred that:

> "Yigazu later obtained third-party financing for the Harmony System from Ascentium
> Capital, and on October 29, 2015, Ascentium paid Alma $104,530, representing the full
> amount due on the Harmony System. At no time did Alma enter into an agreement with

Dr. Yigazu or Yigazu Isthetics regarding financing the purchase of the Harmony System. Moreover, Alma has never received periodic monthly payments from Dr. Yigazu or Yigazu Isthetics for the Harmony System."

Maslowski averred a similar third-party financing transaction regarding the FemiLift system whereby Ascentium paid plaintiff $96,524, which was the balance due minus $5000, on December 15, 2015. Maslowski similarly denied that plaintiff had a financing agreement with defendant, or received periodic payments, for the FemiLift system. Plaintiff applied the remaining $5000 deposit so that the FemiLift system was paid in full.

¶ 22      Maslowski also averred that defendant, on December 3, 2015, contracted with plaintiff to buy the Soprano and VShape systems for $60,850 and $69,950 respectively, plus taxes. As before, the payment schedule referred to in the contracts was on the purchase orders: "USD Deposit with order $10,000. Balance to be paid in full upon" delivery or installation. However, Maslowski agreed to modify the payment schedules for both systems to 90 days, which was noted on the Soprano contract but not noted by Maslowski on the VShape contract. Yigazu requested that his "leftover deposit" be applied to the Soprano and VShape contracts; plaintiff agreed and Maslowski noted so on both purchase orders. On December 9, 2015, plaintiff shipped the Soprano and VShape systems and invoiced defendant for each, with each invoice applying $5000 of the deposit. The balances due on the invoices, including taxes, were $60,642 on the Soprano and $70,270 on the VShape. Defendant received both systems on December 10 and was trained on them by December 17. Maslowski had plaintiff's employees unlock the Soprano and VShape systems by password, or provided defendant passwords, through March 15, 2016. Maslowski learned in the summer of 2016 that Yigazu had been trying to arrange financing of the Soprano system with Partners Capital Group (Partners) and learned in October 2016 that Yigazu told Partners he would not be financing either the Soprano or VShape system through Partners. Maslowski averred that plaintiff never

agreed with defendant or Yigazu to finance the purchase of the Soprano or VShape systems, and plaintiff had not been paid the balance due for either system as of the September 2017 affidavit.

¶ 23    Defendant replied in support of its motion to dismiss, claiming that plaintiff promoted sales of its systems with financing on monthly payment plans by working with Ascentium, a lender "affiliated" with plaintiff. Attached to the reply was Yigazu's affidavit and various advertisements, promotional documents, and emails from Maslowski mentioning payment plans and financing for the systems bought by defendant and mentioning plaintiff and Ascentium together, including Maslowski describing Ascentium to Yigazu as "my primary lender."

¶ 24    Plaintiff filed a surresponse, arguing that the allegations of the motion to dismiss were conclusory, and that plaintiff's advertising and efforts to arrange financing were not misleading to Yigazu and did not alter the payment schedule in the contracts.

¶ 25    Defendant filed a surreply, reiterating its argument that a payment schedule with monthly payments was a condition precedent to the sales contracts at issue so that the failure to agree to monthly payments was the failure of a condition precedent to the contracts being valid so that defendant's motion to dismiss should be granted.

¶ 26                                B. Counterclaim.

¶ 27    In addition to its motion to dismiss the amended complaint, defendant sought leave to file a "revised" counterclaim "adding Illinois Consumer Fraud Act claims." The court granted leave to file in August 2017, and defendant filed its verified counterclaims that same month.

¶ 28    In Count I, defendant alleged that the parties had agreed to the sale of the Harmony and FemiLift systems with payment schedules but those schedules did not apply defendant's down payments. Defendant alleged that it was entitled to a refund of its down payment for each system and asked the court to find that it was entitled to $10,000 "for promised but undelivered marketing and website development services."

¶ 29    Count II alleged that the sale of the Soprano and VShape systems was supposed to be financed according to a payment schedule but the parties never agreed to a schedule so there was no enforceable contract regarding the systems; that is, the failure to agree on payment schedules was the "absence of a condition precedent to contract formation." Defendant asked the court to "declare there is no valid and enforceable contract between the parties as to those two machines," declare plaintiff's invoices on those systems void, and allow plaintiff to recover the locked machines at a reasonable time.

¶ 30    Count III of the counterclaims raised claims under sections 2B (815 ILCS 505/2B (West 2018)) and 2J of the Act that plaintiff "advertised and induced" defendant to purchase its systems "by describing, offering, and leading [defendant] to believe that [the Soprano and VShape systems] would be financed according to long term periodic monthly payment schedules" and then committing "bait-and-switch" by invoicing for the full price and seeking to enforce the invoices. Defendant also alleged that plaintiff failed to provide defendant "the required notice of [its] ability to cancel the transaction within 3 business days" under the Act. Count III sought a declaration that there "was never a valid and enforceable contract between the parties" as to the Soprano and VShape systems, and that the invoices for those systems was null and void, an order that plaintiff accept return of those systems, a finding that plaintiff's "acts were misleading and deceptive and" violated the Act, and an award of "all down payments," damages under the Act, and attorney fees.

¶ 31    Plaintiff filed a motion to dismiss defendant's counterclaims pursuant to sections 2-615 and 2-619(a)(9) of the Code of Civil Procedure. 735 ILCS 5/2-615, 2-619(a)(9) (West 2018). In response to Count I, plaintiff argued that defendant requested that its down payments on the first two systems be applied to the contracts for the latter two systems. In response to Count II, plaintiff argued that it was "unequivocally untrue" that the parties had not agreed to payment schedules for the latter systems "and the claim is further based on the faulty presumption that an agreement on

a payment schedule was a condition precedent to contract formation." As to Count III, plaintiff argued that the Act does not apply to the transactions here and that there was no "bait and switch."

¶ 32    Defendant responded to the motion to dismiss its counterclaims, reiterating its claim that plaintiff promoted sales of its systems with financing on monthly payment plans by working with Ascentium. Defendant also argued that plaintiff's motion failed to distinguish which portions were brought under section 2-615 and which under section 2-619(a)(9), failed to specify the allegedly missing elements of defendant's counterclaims for section 2-615 purposes, and answers the factual allegations of the counterclaims rather than pleading an affirmative matter under section 2-619(a)(9). Defendant argued that plaintiff failed to address the claim regarding web development and marketing services, and that the terms in the contracts for the latter two systems were not payment schedules as the contracts required.

¶ 33    Plaintiff replied in support of its motion to dismiss the counterclaims, arguing that its motion properly labeled each argument as being pursuant to section 2-615 or 2-619, and properly argues the legal insufficiency of the counterclaims. It reiterated the arguments of the motion to dismiss that defendant requested application of the down payments on the first two systems to the purchase of the latter two systems, the contracts for the latter systems were valid and did not lack any conditions precedent, and the counterclaims did not state valid claims under the Act.

¶ 34                              C. Rulings on Motions to Dismiss.

¶ 35    In November 2017, the court ruled on defendant's motion to dismiss the amended complaint and plaintiff's motion to dismiss defendant's counterclaims. The court noted defendant's argument that there was no meeting of the minds, and thus no valid contract, on the Soprano and VShape systems because the contracts required payment schedules but none were agreed to. Yigazu averred that he did not agree to pay the full price for these systems, plaintiff pointed to payment requirements in the contracts as the requisite schedules, and defendant argued

that those terms were not payment schedules. The court found that defendant raised issues of fact not appropriate for dismissal under section 2-619. Defendant similarly raised issues of fact as to whether it was deprived of use of the machines by plaintiff locking them. As to defendant arguing that plaintiff violated section 2J of the Act (815 ILCS 505/2J (West 2018)) by not clearly setting forth a payment schedule, defendant again raised an issue of fact inappropriate for dismissal.

¶ 36    As to plaintiff's motion to dismiss the counterclaims, the court found that defendant sufficiently pled the existence of a condition precedent – payment schedules – for Count II to survive dismissal under section 2-615 or section 2-619. As to Count III, plaintiff argued that the contracts between the parties are not subject to the Act. The court found that defendant sufficiently alleged that plaintiff advertised the availability of monthly payments to fall under section 2J of the Act and survive section 2-615 dismissal, but accepted plaintiff's argument that section 2B of the Act, applying to contracts made with a consumer in the consumer's home, does not apply to Count III. As to Count I of the counterclaims concerning deposits on the first two systems, both parties presented affidavits disputing how the deposits were applied so that issues of fact were raised and dismissal of Count I under section 2-619 would be inappropriate.

¶ 37    Therefore, the court denied the motion to dismiss the amended complaint without prejudice, allowing defendant to raise the issues in the motion as affirmative defenses. The court denied the motion to dismiss the counterclaim under section 2-615, granted it without prejudice under section 2-619 as to Count III's claim under section 2B of the Act, and denied it without prejudice under section 2-619 as to the other counts of the counterclaim. Plaintiff could raise its challenges to Counts I and II of the counterclaim as affirmative defenses, while defendant could file an amended counterclaim as to Count III if after discovery it had enough facts to allege a cause of action under section 2B.

¶ 38                              D. Subsequent Pleadings.

¶ 39    Defendant filed its answer and affirmative defenses in December 2017. It denied that there were valid or enforceable contracts between the parties regarding the latter two systems, denied that any term in the purported contracts or purchase orders for those systems constituted a payment schedule, and maintained that the condition precedent of agreeing to payment schedules was not completed. Defendant admitted that the systems were delivered, and regarding the password email admitted that "an email was sent," but denied that the systems were installed and unlocked.

¶ 40    Defendant's affirmative defenses alleged that plaintiff's practices and representations including sales documents and advertisements were that systems would be delivered and then financed. The parties' transactions on the Harmony and FemiLift systems were consistent with delivery followed by finance, and the preliminary contract documents required payment schedules but none were finalized. As to the Soprano and VShape systems, plaintiff's representative came to defendant's "place of business, represented limited 'Black Friday' prices were temporarily available, and asked for a deposit to secure price." The first affirmative defense was that plaintiff was acting in bad faith contrary to the implied covenant of good faith and fair dealing by not honoring its representations and promises of financing and by demanding full payment on delivery of the latter two systems without payment schedules as required. The second affirmative defense was that plaintiff violated the Act and the Uniform Deceptive Trade Practices Act, 815 ILCS 501/2(a) (West 2018), by not honoring its representations and promises of financing and by demanding full payment on delivery without payment schedules. The third affirmative defense was absence of a condition precedent: a final and enforceable contract was not formed regarding the Soprano and VShape systems because payment schedules were required but not finalized.

¶ 41    Plaintiff filed its answer to defendant's affirmative defenses in January 2018, maintaining that the payment schedule was in the contract documents, denying that its practices or

representations were that systems would be delivered and then financed, and denying that the parties' transactions on the Harmony and FemiLift systems were consistent with delivery followed by finance. Plaintiff admitted that its representative went to defendant's place of business but denied that he "represented limited 'Black Friday' prices were temporarily available, and asked for a deposit to secure price" for the Soprano and VShape systems. Plaintiff denied the allegations in all three affirmative defenses.

¶ 42     Plaintiff filed its answer and affirmative defenses to defendant's counterclaims in December 2017. Generally, plaintiff admitted that Maslowski provided Yigazu information regarding plaintiff, its systems, "and available third-party financing" but denied that it agreed to sell systems to defendant subject to payment schedules with monthly payments. Regarding Count I, plaintiff admitted that defendant made deposits of $15,000 total for the first two systems and that plaintiff did not "yet" provide a $10,000 marketing allowance. Plaintiff denied that defendant paid plaintiff in full for the first two systems, maintaining instead that it applied "a portion" of the deposits and otherwise Ascentium paid plaintiff. Regarding Count II, plaintiff admitted that the parties discussed applying the remainder of the deposit on the first two systems to the latter two systems but denied that invoicing defendant for the latter two systems upon delivery was contrary to any term in the contracts for those systems. Plaintiff also denied locking the machines after unlocking them for training. Regarding Count III, plaintiff noted that the section 2B claims had been dismissed and otherwise denied the allegations except to admit that Maslowski went to defendant's office on December 3, 2015, to discuss buying the latter two systems "as well as available third-party financing."

¶ 43     Plaintiff raised four affirmative defenses: that the counterclaims fail to state a claim upon which relief may be granted, that any relief on the counterclaims should be offset by plaintiff's relief on its breach of contract claim, that the "remaining deposits" on the first two systems were

not returned because defendant "instructed" plaintiff to apply them towards the latter purchase, and that defendant's counterclaims were "a purely private dispute between parties to certain contracts" and thus "beyond the reach of the" Act.

¶ 44    Defendant moved to strike plaintiff's affirmative defenses, arguing that they were not actually affirmative defenses, including that they made no factual allegations. Defendant also argued that the court had already denied three of the defenses: failure to state a claim, that the deposits on the first two systems were not returned because they were to be applied towards the latter two systems, and that the counterclaims did not fall under the Act. The court ordered in March 2018 that plaintiff's affirmative defenses were stricken with leave to refile.

¶ 45    Plaintiff refiled affirmative defenses to the counterclaim, adding factual allegations. After plaintiff and Yigazu had discussions in late 2015, defendant contracted to buy the Harmony and FemiLift systems. "Those contracts contained payment schedules calling for an initial deposit and the balance owed to be paid in full upon delivery." Defendant deposited $15,000 and plaintiff issued an invoice for each system reflecting updated balances. Defendant then obtained financing from Ascentium, which paid plaintiff for both systems; defendant financed the Harmony system in full and financed all but $5000 of the FemiLift system. Plaintiff applied $5000 of the deposit. In December 2015, defendant entered into contracts with plaintiff to buy the Soprano and VShape systems, which "were nearly identical to" the contracts for the first two systems and "contained payment schedules calling for an initial deposit and the balance owed to be paid in full in 90 days." At Yigazu's request, plaintiff applied the remaining deposit. It then issued invoices for the latter two systems, with balances adjusted for the deposit and taxes, requiring payment within 90 days. Plaintiff learned in the summer of 2016 that defendant was working with Partners Capital to finance the purchase of the Soprano system, but then learned in October 2016 that Yigazu had informed Partners that he would not be financing through Partners.

¶ 46   Plaintiff's first affirmative defense was that, contrary to Count I of the counterclaim alleging improper failure to refund deposits after defendant financed the full price of both the Harmony and FemiLift systems, defendant did not finance the full purchase price of both systems and the remaining deposit was applied to the Soprano and VShape systems at Yigazu's request. The second affirmative defense was that, contrary to Count II alleging that the parties never reached a meeting of the minds as to the payment schedules in the Soprano and VShape contracts, those contracts "contain the payment schedule referenced in the Terms and Conditions of Sale," namely a $10,000 deposit with the balance due in 90 days from delivery or installation. Plaintiff noted that both contracts provided that "[t]here are no conditions affecting this agreement which are not expressed herein," and argued that plaintiff was not a party to defendant's financing agreements with Ascentium for the first two systems and thus those agreements were not the payment schedule for those contracts. The third affirmative defense was that, contrary to Count III alleging "bait and switch" when plaintiff offered monthly payment schedules for the first two systems but not the latter two, plaintiff did not offer monthly payment schedules for the first two systems. Instead, defendant arranged financing with Ascentium and made monthly payments to Ascentium, with Yigazu aware of the distinction as he signed the financing agreements for defendant with Ascentium.

¶ 47   Defendant moved to strike the refiled affirmative defenses to its counterclaims, arguing that they were not affirmative defenses. In June 2018, the court found that they "merely negate the factual allegations in the complaint and do not assert any new matter" and dismissed them without prejudice. Plaintiff did not subsequently replead any affirmative defenses.

¶ 48                                E. Summary Judgment.

¶ 49   Plaintiff filed its motion for summary judgment in June 2019, arguing that defendant's argument that there was no valid contract for the systems it bought in December 2015 was "entirely

reliant" on the September 2015 contracts to purchase two other systems. However, the contracts between plaintiff and defendant in December 2015 were substantially identical to the contracts between them in September 2015, with the payment schedule referenced in the contracts being payment in full upon delivery or installation as stated in the purchase orders. When demanded to produce the payment schedules for the earlier contracts to support its theory, defendant produced documents concerning its financing agreements with Ascentium. Said agreements expressly provided that plaintiff was not Ascentium's agent and Ascentium was not plaintiff's agent. Defendant's second counterclaim was similarly based on the lack of payment schedules and similarly fails. Plaintiff argued that, even if a payment schedule was absent, a payment schedule was not a condition precedent to a valid contract and an undefined payment schedule defaults by law to payment upon delivery. Based on the affidavit of Alan Greer, plaintiff's controller and vice president of finance, "[a]s of June 20, 2019 [defendant] owes $208,307.45 on the contracts for [the latter two systems], and interest continues to accrue at a rate of [$]64.55 *per diem*."

¶ 50    The surviving third counterclaim under section 2J of the Act fails, the motion argued, because there was no "bait and switch" under that statute. Defendant was provided marketing documents showing that Ascentium could provide financing for the December 2015 systems as it was available for the first two systems, including that a credit application and approval was required. As shown in Yigazu's deposition, defendant's failure to obtain financing for these systems was due to Yigazu's decision to not provide materials that Ascentium requested, specifically 2014 tax returns for defendant and Yigazu. While defendant then asked plaintiff to take back the systems, plaintiff did not do so. Defendant then sought financing from Partners but failed due to Yigazu not providing all the necessary information.

¶ 51    The first counterclaim concerning deposits fails, the motion argued, because the contract documents, Yigazu's deposition, and Maslowski's affidavit showed that the September 2015

deposits were applied to the December 2015 purchases at Yigazu's behest. The first two systems were not financed in full as defendant alleged – instead, $5000 in deposits was applied then – nor did Yigazu demand the return of his deposit for the earlier systems.

¶ 52    Attached to the summary judgment motion were copies of the pleadings, Maslowski's 2017 affidavit. Greer's affidavit as stated above, and a transcript of Yigazu's deposition.

¶ 53    Yigazu testified that he first heard of plaintiff when he was invited to a conference by Maslowski and spoke with him there. Maslowski then came to one of defendant's offices to meet with Yigazu; he never came to Yigazu's home. After negotiations, Yigazu agreed that defendant would buy the Harmony system from plaintiff and made a $10,000 down payment. The Harmony system was delivered and defendant's technicians used it. He also ordered a FemiLift system that was delivered to and used by defendant. However, the systems were locked until defendant obtained financing from Ascentium by submitting applications to Maslowski. Yigazu could not recall if he submitted the application in his own name or defendant's, as he was defendant's sole representative. Defendant made payments on the two systems to Ascentium. When shown invoices from plaintiff for these systems that were emailed to Yigazu, he did not recall receiving them. One invoice showed $101,524 less a $5000 deposit, or $96,524. Yigazu met later with Maslowski and Greer and agreed in December 2015 that defendant would buy the VShape system. Defendant received the VShape and Soprano systems and its technicians were trained to use them. Yigazu received invoices for these latter systems, and like the invoices for the first two systems the entire balance due was shown. Yigazu applied to Ascentium to finance these systems, and Ascentium repeatedly asked for additional information – 2014 tax returns for defendant – to complete the application. Yigazu did not send defendant's return because defendant corporation was not created until November 2014. However, Yigazu responded by email that he would send the return that day, rather than telling Ascentium he had no return. Ascentium did not finance the two systems.

¶ 54    While Yigazu spoke with someone from Partners, he did not pursue financing with Partners because he had been "debating" financing after Ascentium denied financing, requested Yigazu's personal tax return "[b]ecause they say the business is overexposed," "and then I say no" and "told them to take the equipment." Specifically, Yigazu told Maslowski and Greer that plaintiff should take back the systems, but "[t]hey never accepted." Yigazu later corresponded with Jason Carpenter regarding a website development credit, which Carpenter said "won't be released until, as he says, the lease document is executed." Yigazu expressed dismay at plaintiff linking the two matters and proposed that the credit be released unconditionally. Maslowski then sent Yigazu a list of things that needed to be done to "close" on the latter two systems, including credits from the first two systems. Yigazu wanted the $10,000 deposit for the first two systems reimbursed. As late as August 2016, Yigazu was discussing the latter two systems with Greer. When asked if he had changed his mind about wanting to return the systems, Yigazu replied that he could not pay for them without financing. Yigazu later received from Maslowski and Ascentium's Jason Wise documents with monthly payment options for each of the two systems and a credit application. The documents bore logos of plaintiff and Ascentium and mentioned that they were prepared by Maslowski and Wise but otherwise referred to Ascentium. Copies of the documents were included with the transcript, and they include language on the first page of each that "[y]our proposed finance agreement is subject to credit/document review and approval by Ascentium."

¶ 55    Defendant responded to the summary judgment motion. It argued that plaintiff "advertises and represents to aesthetics customers that transactions for [its] machines are highly profitable almost immediately and involve three sets of documents: (1) Price Quotation/Purchase Order and Deposit Documents; (2) Preliminary Terms and Conditions Documents; and (3) Lease Financing Documents," in that order. While all three sets of documents were finalized for the Harmony and FemiLift systems, the "parties failed to materialize lease financing for" the Soprano and VShape

systems at issue. Defendant argued that plaintiff's summary judgment motion should be denied because plaintiff violated the Act and the implied covenant of good faith, and acted fraudulently and unconscionably, and a condition precedent to valid contracts for the two systems was absent.

¶ 56    Defendant characterized Ascentium as plaintiff's "finance partner" and noted that there was "extensive litigation" against both according to Greer's deposition testimony. Maslowski made representations to Yigazu that plaintiff's systems "were rapidly and highly profitable when leased financed on a monthly basis *** because monthly lease costs would be much less than monthly revenues generated by laser treatments performed each month." The price quotations included language that "ALL ORDERS ARE SUBJECT TO CREDIT APPROVAL BY ALMA LASERS." Defendant noted that when the financing stage was reached, the lease financing application had logos of plaintiff and Ascentium. Yigazu completed the application and sent it to Maslowski, who sent it to Ascentium. Wise asked Maslowski if the lease financing should be priced "normal" or "skinny," and Maslowski replied that it should be "[n]ormal but skinny if necessary." Wise and Maslowski then sent Yigazu financing proposals. The response describes the proposals but does not state what happened to the proposals, such as whether Yigazu replied to them, except to conclude that plaintiff and Ascentium approved lease financing for the Harmony and FemiLift systems but did not approve lease financing for the Soprano and V-Shape systems.

¶ 57    Attached to the response were transcripts of the depositions of Greer and Maslowski. Greer testified that he did not know why plaintiff's logo was on Ascentium documents. While he knew that plaintiff's salespeople discussed leasing and financing with prospective customers, he did not know the particulars as he did not work in sales. Plaintiff's contracts provided for 30-day password control of its systems because "a customer may be given 60 days to pay and with two installments," and the system would be unlocked by password after the first installment was paid, and then permanently unlocked when paid in full. Many of plaintiff's customers lease "[f]rom various

financing entities." The typical payment schedule is that payment is due on delivery, though sometimes terms of 60 or 90 days are extended. The agreements include authority for plaintiff to check the customer's credit and a proviso that all orders are subject to credit approval by plaintiff. Greer explained that plaintiff rarely if ever used that authority. Plaintiff advertises jointly with lenders and facilitates introductions to third-party financing providers, but Greer expressly denied that plaintiff promises approval for financing and maintained that customers must pay their balances by "whichever means necessary." Plaintiff rarely accepts return of its systems, only if the vice-president of sales made a special request and the chief executive officer approved. When Greer was shown messages to the effect that special efforts were being made to sell to Yigazu, he noted that buying four systems in 60 days is atypical and would make Yigazu a "great customer." When shown an email by Maslowski stating that he was "working on financing with" Yigazu, Greer denied that plaintiff was promising financing. While Greer emailed Wise to ask if there would be "any hiccups" on financing Yigazu, he explained that he was "probably" asking about the status of financing because defendant's systems had already been shipped. When asked if financing occurs after systems are shipped, Greer replied that "[e]very sale is different" and noted that defendant asked for and received 90-day terms while some other customers pay cash. Defendant's $15,000 in deposits for the first two systems were not returned because they were either used on those systems or applied towards the latter two systems. Maslowski emailed that the Harmony deposit would be refunded and the FemiLift deposit had been applied to that invoice, but also said that Maslowski would "need the [$10,000] to help him out for deposit reasons."

¶ 58    Maslowski testified that he no longer worked for plaintiff as of his deposition. As a salesman for plaintiff he worked with whatever financing or leasing companies he chose. He worked with firms other than Ascentium including banks, and they did not pay him for bringing them business. He knew Wise from Ascentium because his customers did business with Wise. He

met Yigazu at a conference on medical spas and kept in touch by telephone with some office visits. He helped Yigazu establish a medical spa in hope that he would then buy plaintiff's systems, and he knew Yigazu for about a year before selling him any of plaintiff's systems. In discussing prospective sales, Maslowski and Yigazu both realized that Yigazu would have to finance his purchases because he was still beginning his business. Maslowski sent him materials for Ascentium because plaintiff did not do its own financing. For the first two systems, Maslowski received a financing application from Yigazu and sent it on to Ascentium, which approved financing after Maslowski kept in contact with Wise to expedite matters. When financing proposals were sent to Yigazu, Wise prepared them with data from Maslowski and Ascentium sent them. When Yigazu was considering buying the second two systems, Maslowski emailed Wise to ask if Yigazu needed to submit another credit application, but he could not recall Wise's answer. He was aware of Ascentium's request for tax returns but did not know why Ascentium wanted them beyond that defendant was buying four systems.

¶ 59    Plaintiff replied in support of its summary judgment motion, arguing that defendant's response failed to identify any evidence sufficient to create a genuine issue of material fact and did not dispute that defendant "executed contracts for the purchase of cosmetic laser equipment, that [plaintiff] delivered and installed the equipment and provided training on how to use it, and that after the installation and training were complete, [defendant] refused to remit payment as called for in the contracts." Plaintiff argued that its summary judgment motion and attached exhibits established that "the financing marketing materials *** were not part of the purchase agreement between the parties but instead were financing materials and applications provided by Ascentium, an entity completely unrelated to" plaintiff. The motion also established, and the response did not refute, that Ascentium provided a financing opportunity but defendant "refused to provide necessary paperwork to allow for a proper finance review."

¶ 60    On August 6, 2019, the court granted defendant leave to file deposition exhibits. Its order also stated that the court would rule in writing upon the summary judgment motion by August 19, 2019, and the next court date would be August 21, 2019, "for exchange of trial documents."

¶ 61    The Maslowski deposition exhibits included documents from litigation in which plaintiff herein was suing a person unrelated to this case for paying for its equipment with bad checks, and emails and promotional materials for plaintiff's systems from Maslowski to Yigazu.

¶ 62    The court issued its order on the summary judgment motion on August 19, 2019. It found that no genuine issues of material fact existed as to whether plaintiff (1) promised or offered to provide financing on the latter two systems when it issued its payment schedules, (2) breached its contract with defendant for the first two systems, or (3) violated the Act. Defendant alleged that the parties had no meeting of the minds regarding the latter two systems, plaintiff and Maslowski advertised and represented that any transactions for plaintiff's products would involve lease financing, plaintiff and Ascentium financed the first two machines but then failed to provide financing for the latter systems. However, Yigazu testified in his deposition that he failed to provide Ascentium defendant's tax returns or his own tax returns for 2014, so that plaintiff did not fail to provide financing as alleged. Defendant alleged that plaintiff violated the Act with a "bait and switch" by advertising and inducing defendant to purchase its equipment, including the latter two systems, and leading it to believe that those systems would be financed with long-term schedules of monthly payments. However, the marketing documents stated that financing would require applying for and receiving credit. Yigazu did not provide Ascentium documentation required for financing and then was unsuccessful in obtaining financing from Partners. As to defendant's counterclaim for refund of its deposits on the first two systems, defendant itself alleged that it asked for credit for its earlier down-payments and thus could not deny that it requested to apply its earlier deposit to the latter two systems. The court therefore granted summary judgment

for plaintiff on its complaint as amended and on all three counts of defendant's counterclaims. The order stated that it was "a final order disposing of the case in its entirety" and did not mention the August 21 court date, either to strike it or to change its purpose from the August 6 order.

¶ 63                                    F. Judgment.

¶ 64    On August 21, 2019, the court entered judgment for plaintiff for $212,309.55 in an order reciting that the case was before the court on status of the summary judgment motion.

¶ 65    Defendant filed a motion to set aside or vacate the judgment on August 26, 2019. Noting that the August 19 summary judgment order stated that it was a final disposition, the August 21 court date had been set earlier for exchange of trial documents, and plaintiff filed no written motion to prove-up damages, defendant alleged that plaintiff's counsel "[n]onetheless" attended court on August 21, without defendant's counsel present and without contacting defendant's counsel, and obtained the judgment. "Counsel for plaintiffs has insisted that counsel for defendants allegedly failed to contest plaintiff's motion for summary judgment damages - despite having filed a full response including attachments and exhibits." Defendant argued that the judgment "was obtained without notice and in an ex-parte fashion."

¶ 66    On September 11, 2019, the court entered and continued defendant's motion to September 20, 2019. Defendant filed a notice of appeal on September 18, 2019. The court heard and denied defendant's motion to vacate the judgment on September 20, 2019.

¶ 67                                    III. ANALYSIS.

¶ 68    On appeal, defendant contends that the trial court erred in (1) denying defendant's motion to dismiss the complaint as amended and granting plaintiff's motion to dismiss defendant's fraud counterclaim, (2) granting plaintiff's summary judgment motion, and (3) entering judgment *ex parte* and not vacating it.

¶ 69                                    A. Motions to Dismiss.

¶ 70    Defendant first contends that the court erred in denying its section 2-619 motion to dismiss the complaint as amended and granting plaintiff's motion to dismiss defendant's fraud counterclaim under section 2B of the Act. Plaintiff responds that the court properly denied defendant's section 2-619 motion because it did not raise affirmative matters defeating plaintiff's claim but challenged the allegations in the claim, and properly dismissed defendant's section 2B fraud counterclaim because defendant had abandoned it and section 2B is inapplicable to the sales at issue. Defendant replies that plaintiff has not addressed defendant's section 2C counterclaim and that defendant established its other counterclaims under the Act.

¶ 71    A pleading or portion thereof may be dismissed pursuant to section 2-615 or 2-619. 735 ILCS 5/2-615(a), 2-619(a), (b) (West 2018). A section 2-615 motion challenges the legal sufficiency of a pleading by alleging defects on its face. *Tzakis v. Maine Township*, 2020 IL 125017, ¶ 26. A cause of action should not be dismissed under section 2-615 unless it is clearly apparent that no set of facts can be proved that would entitle the claimant to recovery. *Id*. A section 2-619 motion admits the legal sufficiency of the pleading but raises a defense that allegedly defeats it. *State ex rel. Leibowitz v. Family Vision Care*, 2020 IL 124754, ¶ 31. In reviewing the disposition of a section 2-619 motion, the key issue is whether the existence of a genuine issue of material fact should have precluded dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law. *Rocha v. FedEx Corp.*, 2020 IL App (1st) 190041, ¶ 80.

¶ 72    On review of the disposition of a section 2-615 or 2-619 motion, we accept as true all well-pled facts and all reasonable inferences that may be drawn from them, and we construe the allegations in a complaint or counterclaim in the light most favorable to the claimant. *Family Vision Care*, 2020 IL 124754, ¶ 8; *Doe v. Coe*, 2019 IL 123521, ¶ 20. We review *de novo* a dismissal under section 2-615 or 2-619. *Ammons v. Canadian National Ry.*, 2019 IL 124454, ¶ 13.

¶ 73    To establish a breach of contract, a plaintiff must prove (1) a valid and enforceable contract exists, (2) the plaintiff substantially performed, (3) the defendant committed a breach, and (4) damages resulted. *Rocha v. FedEx Corp.*, 2020 IL App (1st) 190041, ¶ 95.

¶ 74    Section 2B of the Act (815 ILCS 505/2B (West 2018)) governs "a sale of merchandise involving $25 or more *** made or contracted to be made whether under a single contract or under multiple contracts, to a consumer by a seller who is physically present at the consumer's residence." For purposes of the Act, a "consumer" is "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household," and a "person" includes a corporation and its employees, officers, directors, and shareholders. 815 ILCS 505/1(c), (e) (West 2018).

¶ 75    Here, we find no error in the court dismissing defendant's counterclaim under section 2B of the Act. Defendant is a person and a consumer under the Act in this case, having purchased the systems at issue to use them rather than resell them in the ordinary course of its business. However, defendant did not allege that plaintiff or any employee or agent was physically present in Yigazu's residence, and we will not interpret "residence" in section 2B to encompass a person's place of business. Knowing that persons include businesses such as corporations, the legislature could have expressly included a consumer's place of business within the protections of section 2B but did not. With regards to section 2B's concern of sales pressure, there is a substantial difference between a salesperson coming to one's home and to one's office or place of business. Moreover, it does not follow from ordinary language usage, nor from the Act *expressly* defining persons to include corporations, that we *infer* that a corporation's place of business is its "residence."

¶ 76    Defendant notes that the Act provides that "consideration shall be given to the interpretations of the Federal Trade Commission" (815 ILCS 505/2 (West 2018)) and argues that a regulation of that Commission similar to section 2B encompasses transactions outside a buyer's

home. However, while the Commission's regulation of "door-to-door sales" indeed encompasses sale, lease, or rental of consumer goods in a *broader* range of locations than a buyer's residence, it also defines consumer goods significantly more *narrowly* than the Act, limiting them to goods "primarily for personal, family, or household purposes." 16 C.F.R. § 429.0(a), (b) (eff. Mar. 13, 2015). Noting that the transactions at issue here would not be "door-to-door" sales under the Commission's regulation, we conclude that said regulation is sufficiently distinguishable from section 2B of the Act that we will not give it the consideration defendant desires. As the transactions here did not fall under the ambit of section 2B as a matter of law, the trial court did not err in concluding that defendant could not state a claim under section 2B.

¶ 77    As to section 2C, defendant did not refer to that statute in its motion to dismiss the complaint, and plaintiff's motion to dismiss defendant's counterclaims was denied except as to section 2B. Any claim that defendant may have had under section 2C was not disposed of until the summary judgment, and we shall address it below.

¶ 78    Turning to defendant's motion to dismiss the complaint under section 2-619, defendant's claim of a failure of a condition precedent did not admit the legal sufficiency of plaintiff's breach of contract complaint as a section 2-619 motion should. The existence of a valid contract is elemental to a breach of contract claim, but defendant alleged in its motion that there was no valid contract between the parties regarding the systems at issue in the complaint because a condition precedent to forming a contract did not occur. More generally, as the trial court correctly noted, it must accept the well-pled allegations of the complaint and the parties presented contradicting affidavits from Yigazu and Maslowski. On the state of the record at the time the court ruled on the motions to dismiss, the parties had created issues of fact and dismissal was precluded.

¶ 79                              B. Summary Judgment.

¶ 80    Defendant also contends that the trial court erred in granting plaintiff's summary judgment motion on plaintiff's complaint and defendant's counterclaims.

¶ 81    Both plaintiffs and defendants may file for summary judgment. 735 ILCS 5/2-1005(a), (b) (West 2018). It should be granted only where the pleadings, depositions, admissions, and affidavits on file show that there is no genuine issue of material fact and the movant is clearly entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). Summary judgment may be granted on the issue of liability although there is a remaining issue as to the amount of damages. *Id.* A genuine issue of material fact precluding summary judgment exists where material facts are disputed or reasonable persons may draw different inferences from undisputed facts. *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 15. Because summary judgment is a drastic means of disposing of litigation, it should be granted only where the movant's right is clear and free from doubt. *Id*. Therefore, we must construe the pleadings, depositions, admissions, and affidavits strictly against the movant. *Id.* We review *de novo* a grant of summary judgment. *Id*.

¶ 82    We shall address the summary judgment on plaintiff's complaint and the summary judgment on Counts II and III of defendant's counterclaims, alleging failure of a condition precedent and "bait and switch" by plaintiff, together as they are closely related. The contract documents support that the "payment schedule" for the systems at issue was payment within 90 days of delivery or installation. We agree with the trial court that the summary judgment evidence shows that plaintiff did not promise defendant or Yigazu financing, the heart of defendant's "bait and switch" claim. Instead, Yigazu and defendant were informed that financing would require applying for and receiving credit. The notation "ALL ORDERS ARE SUBJECT TO CREDIT APPROVAL BY ALMA LASERS" in the price quotations is a double-edged sword: while it links plaintiff (rather than Ascentium) to extending credit, it also shows that plaintiff's orders are not

simply given financing but subjected to an approval process. Of similar effect is the notation on the first page of the documents from Wise and Maslowski that "[y]our proposed finance agreement is subject to credit/document review and approval by Ascentium." Having been duly informed that he would have to apply for financing to receive it, Yigazu then did not provide Ascentium documentation it required for financing. He admitted not giving Ascentium his personal tax return when requested, and while he testified that he had no return for defendant to provide Ascentium, he told Ascentium that he would be providing the return. The evidence thus shows that defendant's failure to receive financing was not the result of a "bait and switch" by plaintiff nor was there a failure of a condition precedent to contracts between the parties for the systems at issue.

¶ 83    As to Count I of the counterclaim, demanding refund of the deposit for the first two systems, defendant's counterclaim states that "Yigazu also emphasized in the course of these discussions [for the latter two systems] that he would need to be *credited* for his down payments from" the first two systems. (Emphasis added.) The contract documents show that he was indeed credited on the latter two contracts.

¶ 84    Relatedly, defendant contends on appeal that he has a claim under section 2C of the Act. While he has not cited that particular statute until now, we acknowledge that he alleged in the trial court that he had claims under the Act generally. Section 2C of the Act provides in relevant part:

> "If the furnishing of merchandise, whether under purchase order or a contract of sale, is conditioned on the consumer's providing credit references or having a credit rating acceptable to the seller and the seller rejects the credit application of that consumer, the seller must return to the consumer any down payment, whether such down payment is in the form of money, goods, chattels or otherwise, made under that purchase order or contract and may not retain any part thereof." 815 ILCS 505/2C (West 2018).

However, the deposits that were not returned and that were the subject of Count I of defendant's counterclaims were for the earlier two systems, where defendant's credit applications were *not* rejected. Specifically, it was only because of the financing defendant *received* for the first two systems that $10,000 of the $15,000 in deposits on the first two systems was available to be applied to the latter two systems. In sum, plaintiff did not retain deposits or down payments "made under that purchase order or contract" as the "purchase order or a contract of sale" where "the seller rejects the credit application of that consumer." 815 ILCS 505/2C (West 2018).

¶ 85    In sum, we find that the trial court did not err in granting summary judgment for plaintiff on its complaint and defendant's counterclaims.

¶ 86                                    C. Entry of Judgment.

¶ 87    Lastly, defendant contends that the trial court erred in entering judgment and not vacating it because the judgment was entered *ex parte*, based on an excessive interest rate, and had no proper basis for computing damages with a fair degree of probability. Plaintiff responds that the court properly entered judgment in a hearing of which defendant had notice, upon an affidavit not challenged by defendant, at an interest rate that was not improper.

¶ 88    Section 2-1301(e) of the Code of Civil Procedure provides that the trial court "may on motion filed within 30 days after entry thereof set aside any final order or judgment upon any terms and conditions that shall be reasonable." 735 ILCS 5/2-1301(e) (West 2018). The decision to grant or deny such a motion is within the court's sound discretion and will not be reversed absent an abuse of discretion or a denial of substantial justice. *Litvak v. Black*, 2019 IL App (1st) 181707, ¶ 23. A court abuses its discretion if no reasonable person would take the position it adopted or it acted arbitrarily or ignored recognized principles of law. *Id*. Whether substantial justice would be achieved by vacating a judgment is not subject to precise definition, but relevant considerations include diligence or the lack thereof, existence of a meritorious defense, severity of the penalty

resulting from the judgment, and relative hardships on the parties from granting or denying vacatur. *In re Marriage of Harnack & Fanady*, 2014 IL App (1st) 121424, ¶ 45.

¶ 89    Here, as a threshold matter, we have no transcript or equivalent record (see Ill. S. Ct. R. 323 (eff. July 1, 2017)) for August 21, 2019, when the court entered judgment nor September 20, 2019, when it denied vacatur. The appellant – here, defendant – has the burden of presenting a sufficiently complete record to support its claim of error, and any doubts that arise from an incomplete record will be resolved against the appellant. *In re Linda B.*, 2017 IL 119392, ¶ 43.

¶ 90    Defendant was well aware of the court's August 6 order that an August 21 court date would follow its scheduled (and actual) August 19 ruling on plaintiff's summary judgment motion. That date was not stricken in the summary judgment order. Moreover, while the summary judgment order stated that it was final, it also found for plaintiff on its complaint seeking damages but did not fix the amount of damages, so that a prove-up or issuance of a money judgment would be necessary at some point. Diligence or prudence would suggest that defendant's counsel attend the August 21 court date under such circumstances even absent a motion seeking prove-up.

¶ 91    As to the damages assessed in the judgment, plaintiff's summary judgment motion alleged that defendant owed $208,307.45 as of June 20, 2019, with interest accruing at $64.55 daily, and supported that allegation with Greer's affidavit. Defendant's response to the summary judgment motion did not challenge this allegation except to argue that plaintiff was not entitled to summary judgment. Accepting for the moment the $64.55 *per diem* interest, the judgment of $212,309.55 resulted from a simple calculation that 62 days passed from June 20 to the judgment date of August 21. Alternatively, going back further but calculated just as mechanically, $130,912 was owed on the invoices for the two systems as of March 8, 2016, the end of the 90-day payment term, and 1261 days passed until judgment was entered.

¶ 92     Turning back to the *per diem* interest, the terms and conditions of sale in the contracts provided for an 18% interest rate "or the highest rate permitted by applicable law, whichever is less." Simple interest at 18% annually on $130,912 is $23,564 annually or $64.55 daily. Defendant argued in the trial court that the applicable law is the Interest Act (815 ILCS 205/0.01 *et seq.* (West 2018)) with a 9% interest rate cap in section 4 (815 ILCS 205/4 (West 2018)) and contends here that an interest rate above 9% was unlawful. However, "both state and federal courts in Illinois have concluded that the Illinois Interest Act 'does not apply to transactions involving corporations.' " *Asset Exchange II, LLC v. First Choice Bank*, 2011 IL App (1st) 103718, ¶ 21. This rule is "[b]ased on section 4's plain meaning" (*id.*) that "[i]t is lawful to charge, contract for, and receive any rate or amount of interest or compensation with respect to the following transactions: (a) [a]ny loan made to a corporation." 815 ILCS 205/4(1)(a) (West 2018).

> "Defendant maintains that the contract at issue involves the sale of *** equipment rather than a loan, and, therefore, is not exempt from the limitation on interest pursuant to subsection (a) of the usury statute. As stated above, the general provision of the usury statute does not apply to transactions involving corporations. Thus, it matters little whether the transaction at issue is or is not exempt from the general limitation on interest."
>
> *Computer Sales Corp. v. Rousonelos Farms, Inc.*, 190 Ill. App. 3d 388 (1989).

¶ 93     In sum, we cannot conclude on this record that the trial court abused its discretion in not vacating the judgment nor that substantial justice was denied when the court entered its judgment.

¶ 94                                    IV. CONCLUSION.

¶ 95     Accordingly, we affirm the judgment of the circuit court.

¶ 96     Affirmed.